**DEVELOPMENTAL DISABILITIES ADVOCACY CENTER, INC., Harold Tuttle, Alice Graham, Lillian Cooke, Bruce Spinney, by and through their next friend, Freda Smith, and on behalf of all others similarly situated,**

v.

**Jack MELTON, in his official capacity as Superintendent of the Laconia State School and Training Center, Gary Miller, in his official capacity as Director of the Division of Mental Health and Developmental Services.**

Civ.No. 81–330–D.

United States District Court, D. New Hampshire.

Sept. 2, 1981.

---

**21.** *United States v. Marquez*, 363 F.Supp. at 807.

**22.** *Id.* at 807.

Ronald K. Lospennato, Concord, N.H., Kenneth M. Brown, Nashua, N.H., for plaintiffs.

Peter C. Scott, Asst. Atty. Gen., Concord, N. H., for defendants.

## MEMORANDUM OPINION

DEVINE, Chief Judge.

The Developmental Disabilities Advocacy Center, Inc. ("DDAC"), is an entity established pursuant to a section of the Developmentally Disabled Assistance and Bill of Rights Act, 42 U.S.C. § 6000 *et seq.* ("DD Act"). Perceiving that it occupies a "special role" such as to permit it unrestricted access to and review of the records of the mentally retarded residents of Laconia State School and Training Center ("LSS"), it here seeks to challenge certain visitation policies of LSS. The relief sought is injunctive, Rule 65, Fed.R.Civ.P., and declaratory, 28 U.S.C. §§ 2201–2202, in nature. The Court has held a hearing on the preliminary injunctive relief sought and has reviewed the testimony, exhibits, legal memos, and other pertinent documents.

Named as additional plaintiffs (although represented by independent counsel) are four residents of LSS, namely, Harold Tuttle, Alice Graham, Lillian Cooke, and Bruce Spinney. Named as their purported "next friend" is one Freda Smith, a New Hampshire resident who, although unrelated to the named plaintiffs, has for a long time been interested in the rights of the mentally retarded. The named defendants are Jack Melton, Superintendent of LSS, and Gary Miller, Director of the New Hampshire Division of Mental Health and Developmental Services.

DDAC was established in 1979 pursuant to 42 U.S.C. § 6012, which provides in pertinent part:

(a) In order for a State to receive an allotment . . . (1) the State must have in effect a system to protect and advocate the rights of persons with developmental disabilities, (2) such system must (A) have the authority to pursue legal, administrative, and other appropriate remedies to ensure the protection of the rights of such persons who are receiving treatment, services or habilitation within the State, (B) not be administered by the State Planning Council, and (C) be independent of any agency which provides treatment, services, or habilitation to persons with developmental disabilities. . . .

At the time of the establishment of DDAC, LSS was engaged in extensive litigation over the rights of its residents, with an almost daily influx of attorneys, experts, and others involved in the preparation and trial of that litigation.[1] Subsequent to the completion of that trial, LSS turned its attention to the traffic flow of such visitors, generally requiring that visitors report to the main administration building, and if they were not parents, relatives, legal guardians, court-appointed representatives, or other official representatives, or lacked documented proof to visit, they were to be denied such visitation. In the event of questioning of denial of access, they were to be referred to the office of the New Hampshire Attorney General. *See* Plaintiffs' Exhibit 2. At the request of DDAC, subsequently, LSS through conference with the office of said Attorney General sought to issue more detailed visitation regulations (Defendants' Exhibits A, B, C, D), but DDAC contends that these are unsatisfactory, as they contravene both statutorily and constitutionally established rights of the parties whom DDAC seeks to represent.[2] We commence our review by a brief outline of the facts applicable to each purported plaintiff.

Harold Tuttle is a seventeen-year-old minor resident of LSS who has been afflicted since birth with spina bifida, a congenital anomaly characterized generally by a defect in the bony encasement of the spinal cord. *See* Dorland's Illustrated Medical Dictionary, 24th ed., 1965 (W.P. Saunders Company), p. 1418. In his case, it was a causal factor in the loss of function and sensation in the lower extremities, and as a result of this lack of control, young Tuttle has apparently over the years suffered numerous and severe fractures of these portions of his anatomy. A serious medical problem having developed, Tuttle's mother, who is his natural guardian, was called in to consult relative to the opinion of three orthopedic surgeons who had examined Harold and who had recommended bilateral amputation as the most efficacious treatment. All alternatives having been placed before her, Tuttle's mother granted consent to such surgery and, subsequent thereto, Tuttle has demonstrated marked improvement in his adjustment to treatment with the assistance of adaptive equipment.

One of the attorneys involved in the then-pending case of *Garrity v. Gallen*, n.1, *supra*, had seen Tuttle both before and after this surgery, and questioned the necessity therefor. Accordingly, he referred the matter to DDAC by a letter of February 3, 1981. Plaintiffs' Exhibit 1. However, DDAC lacked written permission from Tuttle's mother and natural guardian to discuss the matter with him or to review his records, and upon being advised that DDAC wished to act as an advocate in Tuttle's behalf, Tuttle's mother denied, in writing, the right of DDAC to do so. Defendants' Exhibit E. In Tuttle's case, DDAC contends that it (or apparently any other attorney) has the right to override the wishes of the mother and natural guardian and pro-

---

1. The litigation occupied over 40 days in the spring and summer of 1980, and this Court's Opinion therein has recently been issued. *See Garrity v. Gallen*, 522 F.Supp. 171 (D.C.N.H. 1981).

2. The Complaint seeks to have this matter certified as a class action pursuant to the provi-

sions of Rule 23, Fed.R.Civ.P. Because, as the Court hereinafter concludes, the instant action poses questions which must be disposed of on an individualized basis as to each resident of LSS, the Court will, as hereinafter indicated, deny certification.

ceed to investigate and determine what it perceives to be in Tuttle's best interest.

Alice Graham is a sixty-two-year-old female resident whose legally-appointed guardian is her brother James Graham. She has previously been (unsuccessfully) placed in a community residence and returned to Laconia, but desires to try placement again. As regards community placement of its residents, it is the policy at LSS that when the interdisciplinary team (IDT) agrees, permission is first sought from the guardian (if such guardian exists), and placement is sought (in 99% of cases) in the community of origin. The IDT having recommended such placement for Alice Graham, opportunity for placement was sought in her home community, but such was unavailable. Additionally, her brother and guardian, feeling that it was best for Alice to remain at LSS, denied her permission for community placement. Plaintiffs' Exhibit 5. It appears that there may well be vacancies in community placements in communities other than that of origin, but in light of the guardian's refusal, LSS has refused to override the guardian's wishes and place Alice in such vacancy.[3]

Lillian Cooke is another adult female resident of LSS and is the only named plaintiff so resident who is without guardian.[4] She attempted to initiate contact with DDAC relative to assistance in helping her to gain community placement, but was told and in turn so advised the representative of DDAC that she would be unable to sign any papers seeking the right of DDAC to review her records.

Plaintiff Bruce Spinney is under the guardianship of his sister, and on or about April 1, 1981, spoke briefly with a representative of DDAC who had been granted oral but not written authority to speak to him and review his records. The representative of DDAC was required to carry on this conversation in the presence of a member of the LSS staff, and upon subsequently procuring written authorization of the guardian, was allowed to review the records of Spinney, but in the interim Spinney was transferred to placement in a nursing home.

Freda Smith is the mother of a former resident of LSS who herself has been involved in the rights of the mentally retarded for some time, having been active in the case of *Garrity v. Gallen, supra.* From her association at LSS, she probably knows the named plaintiffs, although her testimony was to the effect that she could not directly recall having specifically visited with any of them.

Review of the spate of overblown rhetoric advanced both orally and in writing in the course of this litigation might lead one to believe that the associational rights under the First and the right of access to courts under the Fourteenth Amendments are somehow implicated. They are not. Resolution of the legal issues in this case does, however, require review of the more elementary relations involved as between attorney and client and guardian and ward, to which relations we now direct our attention.

### 1. *The Attorney-Client Relation.*

The relation between an attorney and client is a personal one, which involves the highest personal trust and confidence, and it cannot be delegated without consent. *Alpern v. Hurwitz,* 644 F.2d 943 (2d Cir. 1981); 7 Am.Jur.2d, Attorneys At Law § 119, pp. 188–89. While in recent years a perception of consumer demand has led to relaxation of the strict rule governing advertising by attorneys, *Bates v. State Bar Of Arizona,* 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977), even to the extent of permitting the transmission of letters to

---

**3.** Evidence before the Court was to the effect that when the IDT and other staff members at LSS who were involved in the daily care of the resident felt that the "best interests" of the resident so warranted, they would override the guardian's refusal to agree to community placement.

**4.** In its Orders concluding its recently-issued Opinion in *Garrity v. Gallen, supra,* the Court included, *inter alia,* an Order to the defendant Melton (p. 182, ¶ 5) for the obtaining and nominating of a guardian for every resident of LSS who required such.

prospective litigants containing offers to explain their legal rights, *In re Primus*, 436 U.S. 412, 98 S.Ct. 1893, 56 L.Ed.2d 417 (1978), direct solicitation of clients by attorneys is still strictly forbidden. *Ohralik v. Ohio State Bar Association*, 436 U.S. 447, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978).

The DD Act, 42 U.S.C. § 6000 *et seq.*, as this Court has recently held, *Garrity v. Gallen, supra,* pp. 195–205, grants to residents of LSS only the limited private right of action against the Secretary of Health and Human Services seeking to require performance by the Secretary of the duties imposed upon him by such statute. The language of § 6012, *supra* at p. ——, indicates that DDAC itself is created as a condition of receiving the funding under the DD Act, and the Court finds that, like the residents of LSS, DDAC is granted no "preferred status" to represent the developmentally impaired residents at LSS. In short, the DD Act affords DDAC merely the same rights as such residents.

■ Additionally, the non-discrimination section (§ 504) of the Rehabilitation Act of 1973, 29 U.S.C. § 794, grants the residents of LSS a private right of action, *Garrity v. Gallen, supra,* pp. 205–218, which entitles them to the individualized education and training programs which we have therein outlined. Nowhere, however, in said statute or its supporting regulations does the Court find any support for the theory that DDAC is somehow empowered by the terms of this statute to adopt a special role in dealing with the residents of LSS. In short, neither of these federal statutes contain a clear expression by the Congress which would contradict the professional responsibilities of an attorney in accordance with well-established traditional rules. *Cooper v. Lewis*, 644 F.2d 1077, 1086 (5th Cir. 1981). And the fact that DDAC is a legal services organization does not alter the attorney-client relation, for such organizations are held to the same rules in dealing with their clients as are individual practitioners. *Woods v. Covington County Bank*, 537 F.2d 804, 815, n. 15 (5th Cir. 1976);

*George v. LeBlanc*, 78 F.R.D. 281, 287 (N.D. Tex.), *aff'd without opinion*, 565 F.2d 1213 (5th Cir. 1977), *rehearing denied*, 568 F.2d 206 (5th Cir. 1978).

■ Turning, then, to the New Hampshire statute, which purports to provide "Services For The Developmentally Impaired", RSA 171–A,[5] pursuant to our pendent jurisdiction, *United Mineworkers v. Gibbs*, 383 U.S. 715, 725–26, 86 S.Ct. 1130, 1138–39, 16 L.Ed.2d 218 (1966), our review of same again demonstrates that it affords DDAC no rights additional to those which would be possessed by private legal practitioners. The statute is designed to provide a system for the delivery of comprehensive services for developmentally impaired persons, including all residents of LSS, pursuant to the supervision of the Director of the Division of Mental Health. When recommendations are made for placement at LSS or in any other residential setting, the clients have the right to representation by legal counsel, and a hearing before the Director, with the client to pay the costs of legal services rendered in connection with procedures, but, if the client is unable to pay,

> the probate court located in the county where the client resides shall appoint a member of the New Hampshire legal assistance or its successor organization, or an attorney who shall be compensated for his services at the same rate as appointed counsel in a criminal case heard by the superior court.

N.H. RSA 171–A:10(I) (Supp.1979).

And if the client is over 18 but incompetent and does not have a legal guardian, the administrator of any institution or program wherein the client is situate "shall recommend the appointment of a client's parents or guardian while the client was a minor as legal guardian in the petition", absent which the recommendation shall be appointment "of another person . . . who is able and willing to manage the affairs or property or both of the client". RSA 171–A:10(II). And where a guardian has not

---

5. In *Garrity v. Gallen, supra*, we discuss RSA 171–A in detail at pp. 227–236.

been appointed or the administrator has been unable to nominate someone willing or able to serve as such, "the client's representative may consent to, or challenge the recommended placement". RSA 171–A:10(III) (Supp.1979).

A representative of the client is defined as meaning, in the following Order:

the client's parents, or where the parents are deceased or their whereabouts cannot, with due diligence, be ascertained, or if the parents are unwilling or unable to serve because of illness, age, distance, or some other reason, a person designated by the client who is in a position to safeguard the client's interest and who has been designated by the client to so act; or if the client cannot or will not designate a representative, then an individual who is in a position to safeguard the client's interests and who has been designated by the area agency.

RSA 171–A:2(XV–b) (Supp.1979). It can thus be seen that by its terms RSA 171–A provides that residents of LSS who are financially able to do so shall hire their own counsel, if indigent the probate court shall appoint counsel for them, and if guardians are required, parents or those who have been guardians during the minority or representatives duly appointed (with preference, again, given to parents in this regard) are to serve in the required capacities. All of these hearings and appointments are held by the respective state probate courts, and it is obvious that DDAC, absent such court appointment as either counsel or guardian or representative, lacks any preferred standing to pursue the right which it now claims herein. Ample due process is

provided by the above-described provisions of RSA 171–A, albeit without seeking to favor DDAC over any other individual or group that seeks to represent the residents of LSS. See In re Gamble, 118 N.H. 771, 394 A.2d 308 (1978).

2. The Guardian-Ward Relation.

New Hampshire recognizes that parental rights relating to custody and care of minor children occur naturally in our society and are prior to the state itself. In re Penny N., 120 N.H. 269, 270, 414 A.2d 541, 542 (1980); State v. Robert H., 118 N.H. 713, 393 A.2d 1387 (1978). The applicable statute provides that parents are joint guardians of their unmarried minor children, RSA 463:4, and, accordingly, the duty falls primarily upon parents to recognize a child's symptoms of illness and to seek and follow medical advice. In re Penny N., supra.

The 1979 enactment of RSA 464–A (Supp.1979) effected sweeping reforms in New Hampshire's guardianship laws, which are clearly remedial in nature and which have application to cases commenced but not as yet decided as of August 22, 1979, the effective date of the statute. In re Snow Estate, 120 N.H. 590, 419 A.2d 1095 (1980). But the statute is not designed to erect procedural hurdles which only the most persevering and painstaking proposed guardians can overcome, and counsel for proposed wards must consider the best interest and welfare of such ward. In re DeLucca, 121 N.H. 71, 73, 426 A.2d 32, 33 (1981).

The procedure for appointment of guardian for one under "incapacity"[6] permits any "relative, public official, or interested person" to file a verified petition for guardian-

---

6. "Incapacity" is defined as meaning:

a legal, not a medical, disability and shall be measured by functional limitations. It shall be construed to mean or refer to any person who has suffered, is suffering or is likely to suffer substantial harm due to an inability to provide for his personal needs for food, clothing, shelter, health care or safety or an inability to manage his or her property or financial affairs. Inability to provide for personal needs or to manage property shall be evidenced by acts or occurrences, or statements which strongly indicate imminent acts or oc-

currences. All evidence of inability must have occurred within 6 months prior to the filing of the petition and at least one incidence of such behavior must have occurred within 20 days of the filing of the petition for guardianship. Isolated instances of simple negligence or improvidence, lack of resources or any act, occurrence or statement if that act, occurrence or statement is the product of an informed judgment shall not constitute evidence of inability to provide for personal needs or to manage property.

N.H. RSA 464–A:3(XI) (Supp.1979).

ship with the probate court. RSA 464–A:4(I) (Supp.1979). Immediately upon the filing of such petition, the probate court is required to appoint counsel for the proposed ward, RSA 464–A:6(I), and such counsel shall immediately contact the proposed ward to ascertain if the proposed ward wishes to substitute other counsel and shall inform the proposed ward of his or her liability for attorney's fees unless found indigent by the probate court. RSA 464–A:6(II) (Supp.1979). The hearing to be held requires, *inter alia*, application of the rules of evidence and the imposition of a legal presumption of capacity with the burden of proof on petitioner to prove "beyond a reasonable doubt" the incapacity of the proposed ward. RSA 464–A:8(IV) (Supp.1979). Eligibility for guardian includes any competent person who agrees to so serve, including banks or trust companies, but barring institutions or agencies who provide care and custody of the incapacitated person. RSA 464–A:10 (Supp.1979). The probate court must hold biennial hearings to determine whether the guardianship continues to be necessary *"and whether the present guardian is acting in the best interests of the ward"*. RSA 464–A:38(I) (Supp.1979) (emphasis added). Counsel is to be appointed at such hearing, *id.* at (I)(a), but may waive his right to be present if he and the ward do not contest the continuation of guardianship, *id.* at (I)(c). Renewals of guardianships are limited to two years, provided the probate court is satisfied that the grounds for the original appointment continue to exist. RSA 464–A:38(II) (Supp. 1979).

On petition of the ward or "any person interested in his or her welfare, the court may remove a guardian and appoint a successor if it is in the best interests of the ward". RSA 464–A:39(I). If desired, an order adjudicating incapacity may specify a minimum period not to exceed one year, during which no petition seeking a declaration of non-incapacity may be filed without special leave, but subject to such restriction "the ward or any person interested in his or her welfare may petition for an order that he or she is no longer incapacitated and for removal of the guardian". RSA 464–A:39(II) (Supp.1979).[7]

■ A review of the foregoing provisions of RSA 464–A, which the Court believes to be pertinent to the instant litigation, demonstrates that individualized treatment and detailed due process is provided by New Hampshire law for each resident of LSS be they minor or adult. Thus, if challenge is to be made to the actions of the mother of Harold Tuttle, to the brother of Alice Graham, or to the LSS administration with reference to the actions taken as to the placement of Lillian Cooke,[8] such challenge should be, as this Court finds and rules, directed to the New Hampshire probate court of proper jurisdiction. Individualized determinations must be, as this Court has ruled in *Garrity v. Gallen, supra,* made as to each resident of LSS and, accordingly, because of the marked variations as to each such individual, the Court rules that a request for certification of this action as a class action must be and it is herewith denied.

■ Moreover, this is not a case involving any constitutional right of the purported plaintiffs. The residents of LSS are not a suspect class, *Garrity v. Gallen, supra* at 236–37 (and cases therein cited), and we are not here dealing with cases of the ilk of *Planned Parenthood of Central Missouri v. Danforth,* 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976), involving parental interference in well-established constitutional rights of privacy. Indeed, the purported plaintiffs in this action do have a right of privacy and the right to due process amply afforded them by the provisions of RSA 171–A and 464–A. If DDAC or Freda

---

7. Within the meaning of RSA 464–A an "interested person" is defined as meaning any adult who has an interest in the welfare of the person to be protected under the statute. RSA 464–A:3(XIII) (Supp.1979).

8. The guardian of Bruce Spinney has granted DDAC full written authority as to representation and review of his records. This renders, as the Court finds, the case moot as to him.

Smith desire to do so, they may take the necessary steps before the New Hampshire probate courts to seek appointments as guardians or representatives or to seek removal of current guardians of the parties whose interests they here seek to represent. But until they have exhausted the full panoply of such well-crafted legal remedies, they are not properly before this Court. It is hornbook law that no person has the right to appear as attorney for another without first receiving authority from the purported client. *Pueblo of Santa Rosa v. Fall*, 273 U.S. 315, 47 S.Ct. 361, 71 L.Ed. 658 (1927). Any presumption to the contrary has been clearly rebutted in the instant case as to the counsel who purports to appear for Harold Tuttle, Alice Graham, Lillian Cooke, and Bruce Spinney. *Broyles v. Califano*, 495 F.Supp. 4, 8 (E.D.Tenn.1979).[9]

### 3. *Conclusion*

The Court finds and rules that DDAC, counsel who purports to represent the other named plaintiffs herein, and Freda Smith all lack standing to challenge the visitation regulations of LSS. Parenthetically, however, we note that were we to find jurisdiction, we would deal with this case as did the Second Circuit with the remarkably similar factual situation to it presented in *Negron v. Wallace*, 436 F.2d 1139 (2d Cir.), *cert. denied*, 402 U.S. 998, 91 S.Ct. 2184, 29 L.Ed.2d 164 (1971) (indicating that reasonable time and place restriction on visitation of juvenile by attorney does not warrant the issuance of injunctive relief).

For the reasons hereinabove outlined, the motion to dismiss must be and it is herewith granted.

SO ORDERED.

---

[9] The suggestion of purported counsel that his letters to the mother and guardian of Harold Tuttle and the legal guardian of Alice Graham (Plaintiffs' Exhibit 6) announcing that he had self-appointed himself as attorney for their wards somehow required that they voluntarily seek to intervene in this litigation is little short of preposterous. Attributing the actions of counsel to well-meaning eagerness rather than to willful desire to violate the Code of Professional Conduct relative to solicitation of business, the Court fails to see how such letters, unaccompanied as they were by any of the pleadings herein, could serve to do other than confuse the proper guardians of these parties with respect to what legal issues were purportedly being presented to this Court.