REVISED NOVEMBER 18, 2002

UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 01-10292

_____


JOSE MAIZ; ALFONSO ALDAPE LOPEZ, MARGARET GRIFFITHS DE ALDAPE,
ALFONSO ALDAPE GRIFFITHS; ALEJANDRA ALDAPE GRIFFITHS, et. al.,

Plaintiffs - Appellees

RICHARD M. HULL, RECEIVER,

Appellee


VERSUS


AMIR VIRANI, et al.,

Defendants

SANIG INVESTMENTS LIMITED AND TRES VIDAS INVESTMENTS LIMITED,

Appellants


_____

Appeal from the United States District Court
for the Northern District of Texas
_____

October 23, 2002

Before JONES, WIENER, and PARKER, Circuit Judges.

ROBERT M. PARKER, Circuit Judge:


1

This case requires us to consider whether a federal district court can utilize the Texas turnover statute to adjudicate the property rights of a non-judgment debtor corporation not properly before the court so long as the district court makes a factual finding that the corporation is subject to the judgment debtor's control. We find that the Texas turnover statute cannot be utilized to adjudicate the substantive property rights of the two non-judgment debtor corporations in this case without a prior judicial determination which pierces their corporate veils. Therefore, we reverse and remand.

I. **FACTS AND PROCEDURAL HISTORY**

In 1997, the plaintiffs-appellees ("judgment creditors") sued several defendants including Ignacio Santos ("Santos") in federal district court in Atlanta, Georgia. They asserted claims for fraud, breach of fiduciary duty, and RICO violations which all related to various real estate investments they had made in the Atlanta area. After a trial by jury, Plaintiffs received a judgment against Santos and the other defendants for approximately $19 million on December 22, 1999. However, the Atlanta district court did not issue a judgment against the appellants, Sanig Investments Limited ("Sanig") and Tres Vidas Investments Limited ("Tres Vidas").[1] Although Sanig was originally a defendant in the

_____

[1] Sanig and Tres Vidas are corporations. Sanig is a Bahamian corporation formed in 1981. Tres Vidas is a British Virgin island corporation formed in 1995. Although the record is less than clear

2

Atlanta action, it was released from the case at the summary judgment stage. The judgment against the Atlanta defendants has subsequently been affirmed by the Eleventh Circuit.

On January 5, 2000, the plaintiffs-appellees registered their judgment in the Northern District of Texas, Dallas Division, pursuant to 28 U.S.C. § 1963 and filed a "turnover action" pursuant to the Texas Turnover Statute, Tex. Civ. Prac. & Rem. Code § 31.002, to aid in the enforcement of their judgment. The turnover action was clearly instituted against the judgment debtors from the Atlanta case which included Santos in his individual capacity.

On September 7, 2000, the Dallas district court judge issued a turnover order against Santos, Sanig, and Tres Vidas. The district court made a factual finding that Santos effectively owns and controls assets that are titled to Sanig Investments and Tres Vidas. The Sept. 7 turnover order and ensuing implementing orders gave the Receiver the authority to take possession of and sell assets titled to Sanig and Tres Vidas in addition to the assets owned by Santos.[2] On October 20, 2000, the district court held

_____

on this point, we have been informed by appellants' counsel that Sanig and Tres Vidas stock was issued and is held by a trust, (hereinafter referred to as "Citibank trust"). The trust documents are not in the record. However, it is undisputed that the two corporations are held in the Citibank trust and are at least indirectly controlled by the Citibank trust. Subsequent parts of the opinion will demonstrate why the fact that Sanig and Tres Vidas are corporate entities is important to resolving the case.

[2] The specific assets belonging to Sanig and Tres Vidas which have been taken over by the Receiver include the following. With

3

Santos in contempt for failing to comply with the turnover order. A bench warrant was issued for his arrest on October 30, 2000. As of today, he is a fugitive from that warrant.

On February 14, 2001, Sanig and Tres Vidas petitioned for a writ of mandamus. They requested a stay of all proceedings and issuance of orders in the district court. On February 20, 2001, a separate panel denied the writ and motion for stay pending appeal. on February 22, 2001, the district court entered final judgment.

At this point, two appeals ensued. First, Santos, in his individual capacity, appealed the turnover order.[3] Second, Sanig and Tres Vidas separately appealed the turnover order to the extent that it allowed the Receiver to take possession of and sell their corporate assets. This is the appeal currently before us.

## II. STANDARD OF REVIEW

---

respect to Sanig: (1) a condominium in Dallas, Texas; (2) a condominium in South Padre Island, Texas; (3) Citibank Accounts in New York and the Bahamas; and (4) Sanig's interest in various partnerships (many of which appear to be located outside of Texas). The Receiver has already sold Sanig's real property. With respect to Tres Vidas: (1) 50% of the shares of Sanvir Development; (2) 50% of the shares of Signa Development; (3) 50% of the shares of Liberty Custom Homes; and (4) an interest in Highland Park Village, an entity which owns and manages land development projects in the Atlanta area. The combined value of the assets held by Sanig and Tres Vidas is in the tens of millions of dollars.

[3] On July 19, 2001, another panel comprised of Circuit Judges' Smith, Benavides, and Dennis issued an unpublished, per curiam opinion affirming the district court's turnover order. The panel rejected Santos' argument that the district court improperly adjudicated the substantive property rights of third parties.

4

The issues raised concerning standing, whether appellants were properly before the district court, and the timeliness of the notice of appeal filing are issues of law and will be reviewed *de novo*. *Texas Office of Public Utility,* 183 F.3d 393, 419 n.34 (5th Cir. 1999)(standing defense, like all constitutional questions, is reviewed *de novo*). We review the turnover order for abuse of discretion (i.e., whether the trial court acted unreasonably, arbitrarily, or without reference to guiding rules or principles under the turnover statute). *Beaumont Bank, N.A. v. Buller*, 806 S.W.2d 223, 226 (Tex. 1991). In doing so, we note that a trial court's failure to properly analyze the law or apply it to the facts is an abuse of discretion. *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992). However, a trial court's issuance of a turnover order, even if predicated on an erroneous conclusion of law, will not be reversed for abuse of discretion if the judgment is sustainable for any reason. *Beaumont Bank*, 806 S.W.2d at 226.

**III. ANALYSIS**

The crux of the case is whether the Texas turnover statute can be used to strip a non-judgment debtor corporation of its assets, based upon a factual finding that a judgment debtor controls the corporation, without a prior separate proceeding which pierces the non-judgment debtor's corporate veil. However, due to the procedural complexity of the case, several other issues need to be addressed. First, do Sanig and Tres Vidas have standing to appeal

5

the district court's turnover order? Second, did Tres Vidas file a timely notice of appeal? Third, were Sanig and Tres Vidas properly before the district court?

## A. Standing

Appellants posited in their writ of mandamus that they would be unable to directly appeal the turnover orders because they were not parties to the case. Now, they argue that they do have standing to appeal these orders. The judgment creditors contend that appellants should be judicially estopped from taking a position contrary to the one they took in their mandamus petition. *See Ergo Science, Inc. v. Martin*, 73 F.3d 595, 598 (5th Cir. 1996) (judicial estoppel doctrine prevents a party from asserting a position in a legal proceeding that is contrary to a position previously taken in the same or some earlier proceeding). Furthermore, they argue that appellants do not have standing to pursue this appeal should we conclude appellants were not parties to the turnover proceedings at the district court level. *See EEOC v. Louisiana Office of Community Services*, 47 F.3d 1438, 1442 (5th Cir. 1995) ("A person who is not a party to the proceedings below generally cannot appeal the court's judgment"). We reject the judgment creditors' contentions.

## 1. Non-Party Appeal

Although Sanig and Tres Vidas argued in their mandamus petition that they could not directly appeal these orders, the fact

6

is they were wrong. It is true that a non-party generally cannot appeal the district court's judgment below. However, we have also noted that exceptions to this rule may be warranted in certain situations. *See Louisiana Office of Community Services*, 47 F.3d at 1442 (*citing EEOC v. West La. Health Services, Inc.*, 959 F.2d 1277 (5th Cir. 1992) (non-party appeal allowed where EEOC had not pursued appeal in its representative capacity)).

The instant case presents such an exception. Although Sanig and Tres Vidas were not parties to the case, they contend that the district court's turnover order has divested them of property which they own that is worth tens of millions of dollars. Clearly, they allege an actual injury and thus have a personal stake in this appeal. This is sufficient to provide them with standing under Article III. *Lewis v. Al Knutson*, 699 F.2d 230, 236 (5th Cir. 1983). Moreover, it is sufficient to grant them an exception to the general rule that a non-party should not be allowed to appeal the district court's judgment.

## 2. Judicial Estoppel

Although we have applied the doctrine of judicial estoppel in this Circuit in order to protect the integrity of the judicial process, equity requires that we exercise our discretion to apply this doctrine only when it is necessary to protect the integrity of the judicial process. *Ergo Science*, 73 F.3d at 598.

Appellants' arguments are somewhat contradictory. However,

7

due to the factual complexities of the case and the ambiguities in the law on this point, we do not view these contradictions as striking a blow at the integrity of the judicial process. As we see it, the equities weigh in favor of hearing this appeal. Therefore, we will not use the judicial estoppel doctrine to prevent the appeal from going forward. Sanig and Tres Vidas have standing to appeal.

**B.   Tres Vidas' Notice of Appeal**

The district court entered final judgment in this case on February 22, 2001. Sanig and Tres Vidas appealed the judgment to the Fifth Circuit on the same day. Appellees' counsel contended at oral argument that Tres Vidas' appeal was untimely as the final order concerning Tres Vidas was issued in October 2000. We agree that the October 2000 implementing order was the last order addressing Tres Vidas' interest. However, we reject appellees' "timeliness" argument for three reasons.

First, in October 2000, Tres Vidas was not a party to the case. We have, however, determined that Tres Vidas has standing to appeal. On that basis, we place Tres Vidas in the same position as a party-appellant with regard to its appeal. Second, even holding Tres Vidas to the same timeliness standard as a typical party appellant, appellees' timeliness argument is unpersuasive in this instance because Tres Vidas could not have known that the October 20, 2000 implementing order was to be the last order affecting its

8

interest given the many implementing orders the district court issued to supplement the original turnover order. Third, because there is no dispute that Sanig's appeal was timely filed and Tres Vidas' appeal was filed within 14 days of Sanig's, Tres Vidas' appeal qualifies as timely filed under the "multiple appeal" rule set forth in FED. R. APP. P. 4(a)(3).[4] *Cyrak v. Lemon*, 919 F.2d 320, 323-24 (5th Cir. 1990).

**C.  Were Sanig and Tres Vidas properly before the district court?**

Sanig and Tres Vidas argue that they were never properly before the district court. They contend that they were never served with process and did not enter a general appearance. Thus, they reason that the district court failed to acquire *in personam* jurisdiction over them. Because the district court had no jurisdiction over them, they argue that we should void the turnover orders which allow the Receiver to seize their corporate assets. As a corollary to this argument, they suggest that their Fourteenth Amendment due process rights were violated because their assets were taken over by the Receiver and sold without proper notice and

---

[4] Although it is uncontested, we raise *sua sponte* whether we can exercise jurisdiction over these appeals in the first place. *See United States v. West*, 240 F.3d 456, 458 (5th Cir. 2001). The appellants and the appellees have not specifically addressed whether the orders appealed from can constitute "final decisions" for purposes of 28 U.S.C. § 1291. However, to the extent that these orders are properly characterized as interlocutory in nature, we assert jurisdiction over the appeals under the collateral order doctrine. *See SEC v. Forex Asset Management LLC*, 242 F.3d 325, 330 (5th Cir. 2001).

9

a hearing.

Before diving into Sanig's arguments on these points, we note the overall failure of the judgment creditors to utilize the traditional "service of process" procedure to properly bring Sanig and Tres Vidas before the district court. It is a fundamental rule of civil procedure that "[b]efore a federal court may exercise jurisdiction over a defendant, the procedural requirement of service of summons must be satisfied." *Omni Capital International, Ltd., et. al., v. Rudolf Wolf & Co., Ltd.* , et. al., 484 U.S. 97, 104 (1987). However, our review of the record indicates that process was not served on either Sanig or Tres Vidas pursuant to Rule 4 of the Federal Rules of Civil Procedure.

The judgment creditors contend that service was made on the Sanig's attorney of record by facsimile. This argument is unavailing. Putting to one side the issue of whether the attorney allegedly served by fax was appellants' attorney of record, there is no evidence that the alleged attorney had the actual authority to accept service of process. Therefore, the alleged service was not valid. *U.S. v. $184,505.01*, 72 F.3d 1160, 1164, n. 10 (3rd Cir. 1995, *cert. denied* by *McGlory v. U.S.*, 519 U.S. 807 (1996)) (validity of service of process upon the attorney depends upon the actual authority of the attorney to receive process on behalf of the individual).

Despite their failure to serve process, the judgment creditors

argue that Sanig and Tres Vidas made a general appearance and therefore the district court had jurisdiction over them. A party makes a general appearance whenever it invokes the judgment of the court on any question other than jurisdiction. We have previously stated that, "[i]n determining whether conduct is sufficient to be considered a general appearance, the focus is on affirmative action that impliedly recognizes the court's jurisdiction over the parties." *Jones v. Sheehan, Young, & Culp, P.C.*, 82 F.3d 1334, 1340-41 (5th Cir. 1996). Consequently, our task is to identify the conduct alleged to have constituted a general appearance and determine whether it demonstrates the requisite "affirmative action."

In the instant case, attorney J. Allen Smith signed three court documents relating to the Receivership estate which list Sanig below the signature line. Attorney Smith signed one document in which Tres Vidas is listed below the signature line. The documents are entitled: (1) Order Approving Agreed Receivership Business Plan and Expanded Authority of Receiver, filed July 5, 2000 (Sanig and Tres Vidas listed below attorney signature line); (2) Motion for Agreed Restatement of the Receivership Order (Sanig listed below attorney signature line); and (3) Agreed Order for Restatement of the Receivership Order, filed July 31, 2000 (Sanig listed below attorney signature line).

The judgment creditors contend that attorney Smith signed

11

these court documents on behalf of Sanig and Tres Vidas. By signing these documents, they reason that Sanig and Tres Vidas impliedly recognized the district court's jurisdiction over them. We disagree for several reasons.[5]

First, the documents in question were actually prepared by the Receiver, not Sanig and Tres Vidas. Although this point may not be persuasive standing alone, it certainly indicates that neither Sanig nor Tres Vidas initiated any movement to spell out the scope of the Receiver's authority. Second, we note that Sanig and Tres Vidas did not appear by themselves underneath the attorney signature line. Several other entities appeared as well underneath the attorney signature line. This fact makes it less likely that Sanig and Tres Vidas truly intended to submit themselves to the jurisdiction of the court and makes it more likely that the signing

---

[5] Texas law presumes that an attorney has the authority to sign pleadings on behalf of the client. *Grey v. First National Bank in Dallas*, 393 F.2d 371, 384 n.17 (5th Cir. 1968). However, an attorney does not have the authority to act on behalf of the purported client if the purported client did not hire the attorney to represent him. *See Developmental Disabilities Advocacy Center, Inc. v. Melton*, 521 F. Supp. 365, 372 (D. N.H. 1981)(*citing Pueblo of Santa Rosa v. Fall*, 273 U.S. 315 (1927) ("it is hornbook law that no person has the right to appear as attorney for another without first receiving authority from the purported client"). In our view, it is questionable whether the general presumption should be applied in this case because of the dearth of evidence concerning whether appellants hired attorney Smith to act as their representative counsel. Nevertheless, based on our determination that the signing of the three documents does not constitute a general appearance, we need not decide this issue. Consequently, we assume arguendo that Smith represented appellants and had the authority to sign documents on their behalf.

was an oversight. Finally, and of most importance, there is simply no indication that appellants requested relief from the district court or intended to have any direct involvement in the Receivership proceedings. For example, Exhibit 1 to the "Agreed Order for Restatement of the Receivership Order" describes the assets which the Receiver would take under his control. Neither Sanig nor Tres Vidas is listed as a receivership entity. Moreover, none of their assets are listed as receivership assets. Because acquiescence to the terms of the receivership orders had no bearing on Sanig and Tres Vidas, we fail to see how their conduct rises to the "affirmative action" level required by our case law.

In *Jones*, 82 F.3d at 1340-41, we determined that the filing of a motion to strike an intervention was an affirmative act recognizing the court's jurisdiction. We also cited approvingly to a Texas appellate case which determined that the filing of a motion to compel arbitration and stay litigation was an affirmative act. *Id.* at 341; *see Fridl v. Cook*, 908 S.W.2d 507, 515 (Tex. App. - El Paso 1995, *writ dismissed w.o.j).*

*Jones* and *Fridl*, however, are distinguishable from the instant case. In those cases, the parties in question filed their own motions which specifically requested a ruling from the trial court. The motion, if granted, provided them with a benefit. Here, neither Sanig nor Tres Vidas requested a ruling which would provide them with any benefit, or relief. Therefore, there was no

13

"affirmative act" which impliedly recognized the court's jurisdiction.[6]

## D. Turnover Statute

Sanig and Tres Vidas argue that we should void the turnover orders as applied to them because of the lack of jurisdiction. However, the judgment creditors and the Receiver contend that the turnover orders can still be upheld even if Sanig and Tres Vidas were not properly before the district court. They argue that while appellants held title to the corporate assets, the district court made a factual finding that Santos actually controlled the trust which held the corporation and, therefore, Santos had control over corporate assets. Consequently, they claim that the district court had the authority to issue the turnover orders pursuant to the terms of the turnover statute.

It is undisputed that the district court had jurisdiction over Santos in his individual capacity. Therefore, we must address whether the district court's factual determination that Santos actually controlled the corporations' assets is sufficient to justify the enforcement of the turnover orders against Sanig and Tres Vidas. In order to answer this question, we look to the

---

[6] Our precedent which holds that waiver of personal jurisdiction occurs upon the defendant's filing of an answer is congruent with our decision in this case. It is congruent because a defendant's denial in their answer can properly be viewed as an affirmative request for relief, i.e, dismissal of the plaintiff's claims at some later date, which explicitly invokes the judgment of the court.

14

turnover statute language, Texas case law, and our precedent.

**1.   Statute**

Tex. Civ. Prac. & Rem. Code Ann. Sec. 31.002 (Vernon Supp. 2002) is commonly referred to as the Texas turnover statute.  The turnover statute is a procedural mechanism by which judgment creditors can reach assets of a judgment debtor that are otherwise difficult to attach or levy on by ordinary legal process.  *Beaumont Bank v. Buller*, 806 S.W.2d 223, 224 (Tex. 1991).  In pertinent part, Section 31.002 states:

> (a) A judgment creditor is entitled to aid from a court of appropriate jurisdiction through injunction or other means in order to reach property to obtain satisfaction on the judgment if the judgment debtor owns property, including present or future rights to property, that:
>
> (1) cannot readily be attached or levied on by ordinary legal process; and
> (2) is not exempt from attachment, execution, or seizure for the satisfaction of liabilities.
>
> (b) The court may:
>
> (1) order the judgment debtor to turn over nonexempt property that is in the debtor's possession or subject to the debtor's control,
> . . .

The judgment creditors argue that, under § 31.002(b)(1), the turnover order as applied to appellants is permissible because the district court specifically found that the Sanig assets were under

15

the control of Santos.[7]   In essence, they contend that turnover orders can be properly enforced against corporations which are non-judgment debtors even though the assets to be taken over by the Receiver are indisputably assets to which title is held by the corporation. We disagree.

The judgment creditors' argument misses the mark because it overlooks the threshold requirement set forth in § 31.002(a) that the judgment debtor actually own the property at issue.  As we see it, subsection (b)(1)'s requirement that turnover property be in the debtor's possession or control must be read *in para materia* with subsection (a) to mean that a court may order turnover of non-exempt property that is in the debtor's possession or subject to the debtor's control only when the judgment debtor owns (has title to) the property in the first place.  Because Santos does not own

---

[7] The district court determined that the Sanig assets were subject to the control of Santos for several reasons.  First, Santos testified by deposition that he is the settlor of the Citibank trust which controls Sanig, he controls the trust, he can change the rules of the trust, and can change the beneficiaries of the trust.   Second, Santos also testified by deposition that Sanig's business is "Nothing, it's just a trust.  It's a – they call it shell company just to have assets, but it has no operation, no day-to-day transaction. It's really to protect estates or money for families.  I mean, that's really what it is."  Third, Santos' filing of his inventory of assets stated that he has a beneficial interest in the Citibank trust, which indirectly owns Sanig Investments, Ltd. through a nominee shareholder.  Fourth, Sanig's 1998 income tax return lists Santos as the 25% foreign shareholder. (Presumably this indicates that he is the nominee shareholder). Fifth, Santos signed a promissory note as a Sanig representative, and requested the payee on the note to wire transfer the funds from the note to Citibank in New York.

the property at issue, his alleged possession or control of the property would not be enough to allow turnover of the Sanig and Tres Vidas assets unless there had been a prior legal adjudication which pierced the two corporations' corporate veils.

**2.    Texas Cases**

The Texas Supreme Court has stated that "Texas courts do not apply the turnover statute to non-judgment debtors."  *Beaumont Bank*, 806 S.W.2d at 227.  Applying this rule, the *Beaumont Bank* court held that the turnover statute could not be used to reach a judgment debtor in her individual capacity when the judgment only imposed liability on that individual in her capacity as representative of an estate.  *Id.*  The *Beaumont Bank* court cited to three Texas appellate court cases to support its holding.[8]  *Id.*  In *Schultz v. Fifth Judicial District Court of Appeals*, 810 S.W.2d 738, 740 (Tex. 1991), however, the Texas Supreme Court also noted that in limited circumstances a court may use the turnover statute to reach assets owned and subject to the control of a judgment debtor even if those assets are held by a third party.  ("Such an order [turnover order] acts as a mandatory injunction against the judgment debtor and, if there are such parties, against the

---

[8] *See Cravens, Dargan & Co. v. Peyton L. Travers Co.*, 770 S.W.2d 573, 576-77 (Tex. App. - Houston [1st Dist.] 1989, writ denied); *Detox Industries, Inc., v. Gullett*, 770 S.W.2d 954, 956 (Tex. App. - Houston [1st Dist.] 1989, no writ); *United Bank Metro v. Plains Overseas Group, Inc.*, 670 S.W.2d 281, 284 (Tex. App. - Houston [1st Dist.] 1983, no writ).

17

receiver and any third parties interested in the property rights being adjudicated").

The uncertainty as to how aggressive trial courts can be in enforcing turnover orders which affect the rights of non-judgment debtors is reflected in the conflicting decisions of the lower Texas appellate courts.[9]  Because the Texas Supreme Court has not

_____

[9] *Compare Dale v. Finance America Corp.*, 929 S.W.2d 495 (Tex. App. - Fort Worth 1996, writ denied) (turnover order properly ordered as to community property held in trust that bore non-judgment debtor spouse's name because trust was subject to judgment debtor's control); *Plaza Court, Ltd. v. West,* 879 S.W.2d 271, 277 (Tex. App. - Houston [14th Dist.] 1994, no writ) (turnover statute would support a proceeding against an entity who is not a judgment debtor if the trial court makes a factual finding that the property on which execution is sought is subject to the possession or control of the judgment debtor, even if retained by a third party); *International Paper v. Garza*, 872 S.W.2d 18, 19 (Tex. App. - Corpus Christi 1994, no writ) ("under certain circumstances an action under the turnover statute may be brought against parties other than the judgment debtor in order to assist the judgment creditor in subjecting the judgment debtor's non-exempt property to satisfaction of the underlying judgment"); *Norsul Oil and Mining Limited v. Commercial Equipment Leasing Co.*, 703 S.W.2d 345, 349 (Tex. App. - San Antonio 1985, no writ) (oil and mining company ordered to turnover 220,000 shares of company stock because trial court found that the shares were actually owned by the judgment debtor); *with Cross, Kieschnick & Co. v. Johnston*, 892 S.W.2d 435, 439 (Tex. App. - San Antonio 1994, no writ) (reversing judgment rendered against partners when underlying judgment involved corporation, holding that it was improper as matter of law to issue order against non-judgment debtor); *Republic Ins. Co. v. Millard*, 825 S.W.2d 780, 783 (Tex. App. - Houston [14th Dist.] 1992, orig. proceeding) (issuing mandamus on grounds that trial court abused its discretion by including debtor's insurance company in turnover order when creditors sought title to debtor's cause of action against insured); *Cravens, Dargan & Co. v. Peyton L. Travers Co.*, 770 S.W.2d 573, 576-77 (Tex. App. - Houston [1st Dist.] 1989, writ denied) (finding that turnover statute could not be used as procedural tool against State Board of Insurance to reach debtor's financial-responsibility deposit with that agency); *United Bank Metro v. Plains Overseas Group, Inc.*, 670 S.W.2d 281, 284 (Tex.

definitively resolved this uncertainty, our prior interpretation of Texas law on this point is especially important.

## 3.   Fifth Circuit Case Law

*Resolution Trust Corp. v. Smith*, 53 F.3d 72 (5th Cir. 1995) is the primary Fifth Circuit case which interprets the turnover statute as it relates to third parties.  In *RTC*, the judgment creditor's conservator asked the district court to void a stock pledge from the judgment debtor, the Smiths, to the Smiths' non-judgment debtor attorney, Fuqua, and order turnover of the stock to the court.  *Id.* at 74.  The district court did both things.  *Id.* at 76.  We upheld the portion of the turnover order which ordered the Smiths to turn over their interest in the stock to the district court.  However, we reversed the portion of the turnover order voiding the pledge to Fuqua.  *Id.* at 80.

We upheld the turnover order as it concerned the Smiths' interest in the stock because, under the terms of the stock pledge agreement which gave Fuqua his security interest, the Smiths

App. – Houston [1st Dist.] 1983, no writ) (determining that creditor who obtained judgment against individual was not entitled to turnover order against corporation until creditor successfully pierced corporate veil in separate proceeding); *Steenland v. Texas Commerce Bank Nat'l Ass'n*, 648 S.W.2d 387, 390-91 (Tex. App. – Tyler 1983, writ ref'd n.r.e.) (concluding that turnover statute does not authorize appointment of receiver to sell homestead to obtain its non-exempt excess value until substantive issues are established in separate proceeding brought for that purpose).

19

continued to own the stock. *Id.* at 78. The only limitation on the Smiths' ownership was that they had to get Fuqua's consent to sell the stock. *Id.* Because the Smiths continued to own the stock, we determined that "the district court did not err in using the turnover statute to order the Smiths to turn over whatever interest they had in the stock to the district court." *Id.*

The district court's voiding of the stock pledge to Fuqua was a different story. Relying upon *Beaumont Bank*, *Republic Insurance*, *Cravens*, and *United Bank Metro*, we reasoned that the voiding of the stock pledge itself on fraudulent transfer grounds went beyond determining whether certain assets were under the control of the judgment debtor and, instead, effectively adjudicated the substantive property rights of a third party. *Id.* at 79-80. Although we recognized the highly suspect nature of the stock pledge, we concluded that the turnover proceeding was not the proper judicial mechanism for determining that the stock pledge was a fraudulent transfer and therefore void. *Id.* at 80. We also noted that it was particularly inappropriate to use the turnover proceeding to adjudicate the substantive property rights of a third party not even before the court. In pertinent part, we stated:

> A proceeding to determine whether a transaction is fraudulent or otherwise to determine property rights of the parties is improper under the turnover statute, for the statute "does not allow for a determination of the substantive rights of involved parties." *Republic Ins.*, 825 S.W.2d at 783; *see also*

20

> *United Bank Metro*, 670 S.W.2d at 284. It is
> even more clear that a party not even before
> the court cannot have its rights determined
> via the turnover proceeding. Thus, in this
> case, the district court erred in using the
> turnover proceeding to determine that the
> stock pledge was a fraudulent transfer and was
> therefore void. The validity of the pledge
> agreement must be challenged in a further
> proceeding. And the sale of the Park Club
> stock must await a determination satisfactory
> to the district court of the validity of
> Fuqua's interest. *Id.* at 80.

## 4. Application

We are persuaded that the *Resolution Trust Corporation* rationale controls the resolution of the instant case. Here, the judgment creditors presented evidence that Sanig is a sham corporation which does not operate any real business, but operates strictly to shield assets from potential creditors. In essence, they contend that Sanig and Tres Vidas' corporate forms are being used by Santos to perpetrate a fraud upon potential creditors. Therefore, the district court appropriately determined that Santos had control over appellants' assets and ordered the receiver to take possession of those assets.

As we were in the *Resolution Trust Corporation* stock pledge situation, we are sympathetic to this type of argument. However, we cannot escape the fact that Sanig is an actual corporation. Sanig and Tres Vidas are distinct legal entities that have substantive property rights in the assets in which they hold title. Thus, the district court does not have the authority to adjudicate

21

these substantive rights under the turnover statute. *Resolution Trust Corp.*, 53 F.3d at 77 ("the turnover statute is purely procedural in nature; the statute does not provide for the determination of the substantive rights of the parties") (*quoting Cross, Kieschnick & Co.*, 892 S.W.2d at 439).

In the case at bar, the district court did not pierce the corporate veils of Sanig and Tres Vidas. Instead, the district court predicated the turnover order as it applied to Sanig and Tres Vidas upon a factual finding that Santos owns and controls the Citibank trust, and therefore owns and controls the two corporations' assets. In our view, this was error. Under Texas law, appellants' property should not have been subjected to turnover because appellants had never been found to be the alter egos of Santos through a "piercing the veil" judicial process. *See United Bank Metro*, 670 S.W.2d at 283 (non-judgment debtor corporations should not be treated as judgment debtors based upon evidence that they are alter egos of judgment debtors without a prior trial on the merits which adjudicates the alter ego issue).[10]

---

[10] We also note that Sanig and Tres Vidas not being properly before the district court raises troubling due process concerns. *See e.g., Ex Parte Swate*, 922 S.W.2d 122, 125 (Gonzalez, J., concurring) ("Whether a turnover order is enforceable by a contempt order directed to a stranger to the lawsuit is a serious matter that goes to the very heart of due process."); *Resolution Trust Corp.*, 53 F.3d at 80 ("It is even more clear that a party not even before the court cannot have its rights determined via the turnover proceeding"). These concerns further bolster our decision in this case.

The judgment creditors rely on three Texas appellate court cases to support their contention that the district court's turnover order was valid: (1) *Norsul Oil and Mining Limited v. Commercial Equipment Leasing Co.*, 703 S.W.2d 345 (Tex. App. - San Antonio 1985, no writ); (2) *Dale v. Finance America Corp.*, 929 S.W.2d 495 (Tex. App. - Fort Worth 1996, writ denied); and (3) *Plaza Court, Ltd. v. West,* 879 S.W.2d 271 (Tex. App. - Houston [14th Dist.] 1994, no writ). We address each case in turn.

*Norsul Oil* is identical to our *Resolution Trust Corporation* decision which affirmed the turnover of the Smiths' interest in the pledged stock. In *Norsul Oil*, 703 S.W.2d at 346, the trial court ordered the non-judgment debtor corporation to turn over stock shares in its possession to the court. The San Antonio Court of Appeals affirmed the turnover order because the trial court properly found, based on evidence that the shares of stock listed the judgment debtor as the record owner, that the stock was indeed owned by the judgment debtor. *Id.* at 347, 349.

Here, the district court could properly have ordered any stock shares owned by Santos in Sanig or Tres Vidas to be turned over to the Receiver. However, the district court did not do this. Instead, it ordered the Receiver to take possession of and sell the two corporations' assets. *Norsul Oil* and the aforementioned portion of *Resolution Trust Court* are thus distinguishable from the case before us.

23

In *Dale v. Finance America Corp.*, 929 S.W.2d at 498, the Fort Worth Court of Appeals interpreted Texas law as allowing a turnover order to be issued against a non-judgment debtor if the property is owned by a judgment debtor and subject to the debtor's possession or control. The *Dale* trial court ordered the judgment debtor, ("husband Dale") to turn over stock he owned in various corporations, money that he owned, and an animal sabre collection he owned. The trial court also ordered a trustee to turn over community property assets held in a trust bearing the name of husband Dale's wife. *Id.* at 497-98.

The appellate court upheld the turnover order. It reasoned that the community property contained in the trust bearing the wife's name was subject to husband Dale's control because the wife testified that husband Dale helped her file the petitions to the trustees for distribution and the trust funneled money to husband Dale's various companies. *Id.* at 499.

Upon close observation, *Dale* is distinguishable from the instant case. Under Texas law, the trustee, not the trust itself, holds legal title to trust property. *See Ridgell v. Ridgell*, 960 S.W.2d 144, 147 (Tex. App. - Corpus Christi 1997, no writ)(noting that the trustee is vested with legal title to trust property). Consequently, the *Dale* court was perhaps justified in looking to whether the judgment debtor actually controlled the trust property. In *Dale*, however, no corporation existed between the trustee and

24

the community property.  Here, two corporations which are separate juridical persons under Texas law own the assets in question and, thus, stand between the trustee and the property.  Consequently, we cannot disregard the important fiction created by the appellants' corporate forms without a formal piercing of the corporate veil.[11]

In *Plaza Court*, 879 S.W.2d at 276-77, the Houston appellate court held that the turnover statute can be used to seize the corporate assets of a non-judgment debtor if either the trial court makes a factual determination that the judgment debtors own at least a controlling majority of the stock or the judgment creditors have previously succeeded in piercing the corporate veil.  We see several flaws in the holding.

First, the Houston appellate court based its determination that the turnover statute can be used to strip a non-judgment debtor corporation of its assets as long as the trial court makes a factual finding that the judgment debtor owned a controlling interest in the corporation on the *Norsul Oil* case.  However,

---

[11] We consistently use the term "piercing the corporate veil" throughout this opinion.  In the typical corporate veil piercing scenario, the corporate veil is pierced so that individual shareholders may be held liable for corporate acts. *See Menetti v. Chavers*, 974 S.W.2d 168, 173 (Tex. App. – San Antonio 1998, no writ).  Here, the purpose of piercing appellants' corporate veils would be to hold the corporations liable for the acts of the individual shareholders.  Therefore, this case presents a "reverse corporate veil piercing" situation.  This slight variation is of no consequence, however, because the end result under both views is the same – two separate entities merge into one for liability purposes.

25

*Norsul Oil* does not support such a broad rule. As we have pointed out, *Norsul Oil* merely stated that the turnover court could order a third party non-judgment debtor to turn over stock owned by the judgment debtor, it did not state that the turnover court could seize corporate assets owned by the non-judgment debtor corporation based upon a factual finding that the judgment debtor is a majority stockholder. Second, the legal principle running through Texas law which allows non-judgment debtor corporate assets to be taken though turnover order only if the corporate veil is pierced will be useless if the turnover statute can be used in this way. Therefore, we do not consider the case to be persuasive authority and decline to follow it.[12]

## IV. CONCLUSION

Sanig and Tres Vidas, both non-judgment debtors, were never properly before the district court. Nevertheless, the district court proceeded to use the turnover statute to adjudicate their substantive property rights even though their corporate veils had not been pierced in a separate judicial proceeding. This was an abuse of discretion because it violates Texas law. Therefore, we overturn the turnover orders to the extent they allowed the

---

[12] Even assuming arguendo that the *Plaza Court* holding is someday accepted by the Texas Supreme Court, the only evidence in the instant case concerning ownership of corporate stock is that Santos is a 25% foreign shareholder in Sanig. Therefore, we have doubts as to whether the evidence supports the district court's finding under the *Plaza Court* view as well.

Receiver to take possession of and sell Sanig and Tres Vidas assets. We reverse and remand for proceedings consistent with this opinion.[13]

---

[13] On remand, the district court can properly order both Sanig and Tres Vidas to turnover share certificates owned by Santos.

EDITH H. JONES, Dissenting:

I agree completely with Judge Parker's careful exposition of the Texas turnover statute and his conclusion that it does not apply in this case. Unfortunately, I do not agree with the majority's judgment, because I believe that a proper reading of the record demonstrates that Sanig and Tres Vidas subjected themselves to the jurisdiction of the district court and therefore to its ultimate orders. On this narrow but critical basis, I respectfully dissent.

The majority correctly note that if the receiver had formally served Sanig or Tres Vidas with process, there would be no doubt of their submission to the district court's jurisdiction. Further, a party may make a general appearance whenever it invokes the judgment of the court on questions other than jurisdiction and in such instances, "the focus is on affirmative action that impliedly recognizes the court's jurisdiction over the parties." Jones v. Sheehan, Young & Culp, P.C., 82 F.3d 1334, 1340-41 (5th Cir. 1996); see also Cactus Pipe & Supply v. M/V Montmartre, 756 F.2d 1103, 1108 (5th Cir. 1985) ("[a]n appearance may also arise by implication 'from a defendant's seeking, taking or agreeing to some step or proceeding in the cause beneficial to himself' . . ." (citation omitted)).

We differ in our interpretation of counsel's actions in representing Sanig and Tres Vidas before the district court. The

majority, in my view, misunderstand the significance of the attorney's signature on the three essential court documents that constituted the receivership: the Order Approving Receivership Business Plan and Expanded Authority of Receiver, entered July 5, 2000; the Motion for Agreed Restatement of the Receivership Order; and the Agreed Order for Restatement of the Receivership Order, entered July 31, 2000. Sanig is a party to each of these documents, as it was included among several entities represented on those documents by the law firm of Settle & Pou, P.C., through attorneys J. Allen Smith and Michael Byrd. Tres Vidas is included within this signature block only on the July 6th agreed order. These typed signature blocks, one of which was specifically interlineated before signature, were signed deliberately and knowledgeably by counsel representing Sanig and Tres Vidas.

Moreover, in the July 5 order, the court found "that parties-in-interest received adequate notice of the Application [by the receiver for approval of the business plan and expansion of his authority], and that the agreements of such parties to the orders herein are evidenced by their execution of the Receiver's Business Plan." The business plan itself says that the agreements outlined therein were approved by "all requisite principals." Appellants' counsel knew what they were doing.

That the inclusion of Sanig and Tres Vidas was no fluke, as the majority imply, is emphasized by their organizational ties

29

with Santos, the principal malefactor.  Sanig seems to be a "front" for Santos, suggesting at a minimum that Sanig had an interest in negotiating with the receiver over the extent of its assets' commitment to the receivership.  Tres Vidas had the same type of interest, as it was a co-owner with Santos of three of Santos's fellow judgment debtors, Sanvir, Signa & Atlanta Associates (the last through its 50% ownership of Signa).  Even if Sanig and Tres Vidas were wholly independent of Santos, a conclusion made doubtful by the surrounding circumstances, their assets were deeply involved in the receivership from its inception.

The majority also appear to have overlooked that in these agreed orders, the receiver took control of assets owned by Sanig and Tres Vidas and gained broad authority to manage and dispose of those assets for the benefit of the receivership.  I must respectfully disagree with the majority's statement that none of Sanig's or Tres Vidas's assets are listed as receivership assets.

In fact, Tres Vidas is a 50% owner of two of the receivership entities, Sanvir and Signa, and a part owner of Highland Park Village partnership.  These are designated as "receivership assets" in the restated receivership order.  Among other things, the order gives the receiver the right to "deal with these assets as if he were the owner thereof."  In addition, Signa (50% owned by Tres Vidas) owned all the stock of Atlanta Associates, another receivership asset, which in turn co-owned

30

various real estate partnership interests with Sanig and other related interests. Replacing Sanvir, the receiver also became the managing partner of six partnerships, three of which were owned in part by Sanig (Newnan Crossing Partnership; Twin Lakes Partnership; Forest Chase Partnership), and he became the receiver for Highland Park Village partnership and The Lakes Partnership, in which Sanig and/or Tres Vidas held interests.

This is not even an exhaustive list of the assets' interrelated ownership and control among Santos, Sanig and Tres Vidas. As part owners of all these entities, Sanig and Tres Vidas were committing substantial discretion to the authority of the receiver. Expressly or by implication, they authorized the receiver to resolve title disputes concerning the assets and to litigate over the extent of Santos's ownership rights.

Unlike the majority, I believe that when Sanig and Tres Vidas allowed their attorney's signature to be affixed to the receivership documents, they went in for a penny, in for a pound, subjecting themselves to the broad authority of the receiver under the ultimate supervision of the district court. That is to say, by voluntarily surrendering nearly all of their assets to the receivership, they agreed to the court's jurisdiction to determine ownership of those assets. It is hard to see what more could be done to constitute "affirmative action" by these entities in recognition of the court's jurisdiction.

31

For these reasons, I disagree with the majority's conclusion that "acquiescence to the terms of the receivership orders had no bearing on Sanig and Tres Vidas."  To the contrary, for all that can be told from the briefs and receivership orders, there is very little of the interests of Sanig and Tres Vidas that did not come under the purview of the receiver.  When they thus became parties to the receivership, they had actual notice of and opportunity to participate in the receivership proceedings that would determine ownership of their assets.  They chose not to defend themselves.  I would hold that the trial court correctly entered judgment against them.  I therefore respectfully dissent.