**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**February 21, 2005**

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

No. 03-60958

ELAINE CHAO, Secretary, Department of Labor,

Petitioner--Cross-Respondent,

versus

OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION,

Respondent,

and

ERIK K. HO; HO HO HO EXPRESS, INC.; and HOUSTON FRUITLAND, INC.,

Respondents--Cross-Petitioners.

On Petition for Review of an Order of the
Occupational Safety and Health Review Commission

Before BARKSDALE, GARZA, and DeMOSS, Circuit Judges.

DeMOSS, Circuit Judge:

This appeal stems from a final order of Respondent Occupational Safety and Health Review Commission (the "Commission"), which vacated in part citations issued by Petitioner--Cross-Respondent Elaine Chao, Secretary of Labor (the "Secretary"), against Respondents--Cross-Petitioners Eric K. Ho

("Ho"), *et al.* (together, "Ho Respondents").  For the following reasons, we DENY the petitions for review and AFFIRM the decision of the Commission.

## BACKGROUND

The penalties assessed by the Secretary and mostly affirmed by the Administrative Law Judge ("ALJ") and the Commission against Ho for various violations of the Occupational Safety and Health Act, 29 U.S.C. §§ 651-678 ("OSH Act"), and associated safety and health regulations all concern his behavior as proprietor of a worksite where workers were exposed to asbestos in the course of a project to renovate a building.  On October 27, 1997, Ho individually purchased a defunct hospital and medical office building in Houston to develop the property as residential housing.  Ho knew there was asbestos onsite.  He was also aware that any alteration to asbestos-containing materials was to be handled by personnel licensed and registered with the Texas Department of Health ("TDH").  Ho instead hired Manuel Escobedo ("Escobedo") and Corston Tate ("Tate"), whose work he had previously used, to do the renovations.  Escobedo hired 11 Mexican nationals, who were illegal immigrants, to assist.  Renovations, including the removal of asbestos, started in January 1998.

At most, the workers were occasionally given dust masks not suitable for protection against asbestos.  They were not issued protective clothing.  Ho also did not provide a respiratory

protection program, conduct medical surveillance, conduct asbestos monitoring, implement adequate ventilation or debris removal, inform the workers of the presence and hazards of asbestos, or provide any training whatsoever. There is no dispute that Ho was aware of the worksite conditions; he visited almost every day.

On February 2, 1998, a city inspector visited the worksite. After observing the conditions, he issued a stop-work order citing the possibility of exposure to asbestos, requiring that city approval be given before work could resume. Ho then began negotiating with a licensed contractor, Alamo Environmental ("Alamo"), to remove the asbestos. Alamo prepared an abatement estimate in accordance with Occupational Safety and Health Administration ("OSHA"), amongst other federal, guidelines. On March 27, 1998, Ho notified Alamo by fax that he agreed to their proposal.

However, during this period of negotiation, Ho had resumed work at the site under the same conditions, except that he directed all work be performed at night. The workers ate, and some lived, at the site. The workers had no potable water and only one portable toilet. Tate sometimes allowed workers to leave the property to use the restroom at a nearby commercial establishment; and Tate would purchase and bring back food for the workers when they gave him money. Ho continued to visit the worksite and was aware of these conditions.

Asbestos removal continued in this fashion until March 10,

1998.  On March 11, 1998, as Ho had directed, daytime work resumed at the site.  Ho had been informed that either the sprinkler system or fire hydrant valves had not been turned off and thus remained available for use.  To wash out the building, Ho directed Tate to tap into an unmarked valve believed to be a water line.  It turned out to be a gas line.  An explosion later occurred when Tate started his truck; it injured Tate and two workers.  On March 12, 1998, workers were summoned to Ho's office where they were given releases to sign, acknowledging receipt of $1000 as full payment for their work, and acknowledging receipt of $100 to release Ho from any claims that might arise from the explosion and fire.  The releases were written in English, but an interpreter translated them for the workers.

After the explosion, TDH conducted an investigation.  Samples of debris and the ambient air at the worksite showed levels of asbestos in excess of federal and state standards.  The state notified Ho that the site remained unsafe and needed to be sealed by qualified personnel.  Again, Ho used the same workers to install plywood over the windows and did not give them any protective equipment.

OSHA also conducted an investigation.  As a result, the Secretary issued a total of 10 serious and 29 willful violations against Ho Respondents; these charges included 11 willful violations of 29 C.F.R. § 1926.1101(h)(1)(i) for failing to provide respirators to 11 employees removing asbestos and 11 willful

4

violations of 29 C.F.R. § 1926.1101(k)(9)(i) and (viii) for failing to train the 11 employees on the hazards of asbestos and safety precautions. The Secretary also charged Ho Respondents with willfully violating the OSH Act's general duty clause, 29 U.S.C. § 654(a)(1), by ordering Tate to tap into the unmarked pipeline. Ho was also convicted of criminal violations of the Clean Air Act ("CAA"). This Court upheld his conviction. *United States v. Ho*, 311 F.3d 589, 611 (5th Cir. 2002).

Ho conceded before the ALJ that he violated the asbestos respirator and training standards. Ho argued that he was not subject to the OSH Act's requirements because he was not engaged in a business affecting interstate commerce and that the corporate Ho Respondents should be dismissed because they were not employers of the employees engaged in asbestos removal. He also challenged the per-employee citations of the respirator and training violations. Finally, Ho contended he did not violate the general duty clause of the OSH Act, or if he had violated it, that such violation was not willful.

The ALJ ruled that Ho's construction activities affected interstate commerce and Ho was liable for the OSH Act violations. He also found the corporate Ho Respondents liable as alter egos of Ho and under the "sham to perpetuate a fraud" doctrine because Ho exercised control over both corporations and used them to obtain funds to purchase and renovate the property. The ALJ determined

5

the respirator and training violations were willful and upheld all 22 violations.  The ALJ found also that Ho had violated the general duty clause of the OSH Act but that it could not be characterized as a willful violation because the Secretary failed to show that Ho actually knew of the danger or had a heightened awareness of the illegality of his conduct.

On review, the Commission affirmed that Ho was subject to the OSH Act and that Ho's violations of the respirator and training standards were willful.  A divided Commission ruled that such violations were to be cited on a per-instance, not a per-employee, basis because it felt that the regulations plainly imposed a duty on employers to have a single training program and to provide respirators to the employees as a group.  It thus vacated all but two of those citations.  The Commission also concluded the record did not support the ALJ's finding that the corporate Ho Respondents were liable because these entities' primary business activities had nothing to do with the hospital renovation and they did not exist as mere business conduits for Ho's own purposes.[1]  The Commission affirmed the ALJ's finding that the general duty violation committed by Ho was not willful.  The Commission also increased all the citations affirmed to their maximum penalties because of Ho's lack of good faith.  The Secretary timely filed her petition for

---

[1]Although the Commission determined the corporate Ho Respondents were not liable under both the "alter ego" and "sham to perpetuate a fraud" theories, the Secretary did not brief any argument based on the "sham" doctrine.  Thus, we do not address it.

6

review, and the Ho Respondents timely filed their cross-petition.

## DISCUSSION

**Whether the Commission's factual finding that Ho's illegal asbestos abatement activities at the hospital worksite affected interstate commerce was supported by substantial evidence.**

The OSH Act applies to employers, defined as "person[s] engaged in a business affecting commerce who ha[ve] employees." 29 U.S.C. § 652(5) (1970). By enacting the OSH Act, Congress intended to exercise the full extent of the authority granted by the Commerce Clause. *Austin Road Co. v. OSHRC*, 683 F.2d 905, 907 (5th Cir. 1982). "Accordingly, an employer comes under the aegis of the [OSH] Act by merely affecting commerce; it is not necessary that the employer be engaged directly in interstate commerce." *Id.* (citations omitted).

The Secretary bears "the burden of showing that the employer's activities affect interstate commerce." *Id.* at 907. This burden is "modest, if indeed not light." *Id.* On appeal, this Court only reviews the Commission's findings of fact to ensure they are "supported by substantial evidence in the record considered as a whole." *Id.* at 908; *see also* 29 U.S.C. § 660(a). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 619-20 (1966) (citation omitted).

Ho Respondents argue that the Secretary put forth no evidence to support the Commission's finding that the building renovation

7

was a business affecting interstate commerce. Because the Secretary failed to provide jurisdictional evidence, Ho Respondents contend none of them was subject to the OSH Act. Moreover, Ho Respondents charge the Secretary cannot rely on the Commission's finding of fact because the Commission relied on an inapplicable Ninth Circuit *per se* rule, *see Usery v. Lacy*, 628 F.2d 1226, 1229 (9th Cir. 1980) (extending OSH Act reach over employers in the construction industry whose "whose activities in the aggregate affect commerce"), and a nonpreclusive jurisdictional finding of this Court in the criminal action against Ho based on the "aggregate" effect on interstate commerce of asbestos removal violations under the CAA, *see Ho*, 311 F.3d at 603-04.

The Secretary responds that she provided evidence that Ho was engaged in a business affecting interstate commerce and was therefore subject to the OSH Act. The Secretary points out Ho had a majority interest in two interstate trucking firms (Ho Ho Ho Express being one). Alternatively, the Secretary argues Ho's asbestos abatement activities at the hospital site constituted a business affecting interstate commerce. The Secretary notes this Court has previously held that Ho's illicit asbestos operations at the hospital site, when aggregated, affected the interstate markets in asbestos removal services and commercial real estate in the context of Ho's CAA criminal case. *Id.* The Secretary maintains Ho's activities at the hospital were specifically found to affect

8

interstate commerce substantially enough to support federal regulation; this issue cannot be relitigated. The Secretary also argues Ho misreads *Austin Road* to impose an evidentiary hurdle to defeat even normal application of collateral estoppel.

Even if this Court does not find jurisdiction based on collateral estoppel, the Secretary stresses she presented evidence showing that, by failing to comply with the OSH Act requirements, Ho gained a competitive advantage over licensed asbestos firms, including Alamo, and deprived them of a commercial business opportunity in the national market for asbestos removal. Moreover, the Secretary argues Ho's illicit asbestos removal project also would increase asbestos removal costs for law-abiding commercial property owners.

This Court in Ho's criminal appeal clearly indicated that his specific illicit construction activities concerning asbestos abatement, when considered in the aggregate, directly affected interstate commerce in the national market of asbestos removal. *Ho*, 311 F.3d at 603-04. In finding that the challenged provisions of the CAA constitutionally reached Ho under the Commerce Clause, we stated that "a national market exists for asbestos removal services" and that "Ho's activities would injure this market." *Id.* at 603. We also stated that Ho's illegal asbestos abatement activities in the aggregate "posed a threat to the interstate commercial real estate market" because they "would reduce the

9

number of companies providing asbestos removal services" and "conscientious property owners would have more trouble locating licensed abatement companies and likely would have to pay higher prices." *Id.* at 604.

Here, though we are informed by the aggregation principle's application to asbestos removal activities outlined in *Ho*, as the Commission was also so informed, we do not rest the instant jurisdictional result based on collateral estoppel or issue preclusion from Ho's criminal CAA case.[2] Nor do we have before us the constitutionality of any provision of the OSH Act or accompanying regulation. We also do not recognize the Ninth Circuit *per se* construction rule Ho Respondents insist was adopted by the Commission in its decision. Instead, pursuant to **Austin Road**, we consider whether the Commission's factual finding that Ho's illegal asbestos abatement activities at the hospital worksite affected interstate commerce was supported by substantial evidence in the record.

---

[2]It would not be prudent to do so because even if Ho Respondents had presented any constitutional challenge to the specific OSH Act and implementing regulations at issue here, these provisions are entirely different from the Clean Air Act ("CAA") provisions challenged in the prior criminal litigation. Thus, the issue at stake here would not be "the precise constitutional claim" involved in the prior litigation. *See* **Montana v. United States**, 440 U.S. 147, 156-57 (1979) (finding tax provision of Montana's Revenue Code was constitutional under the Supremacy Clause via collateral estoppel where identical provision had previously been found to pass muster). Moreover, we specifically stressed that the holding in *Ho* was limited to that CAA criminal case. **United States v. Ho**, 311 F.3d 589, 594 (5th Cir. 2002).

10

Despite Ho Respondents' arguments, there is sufficient record evidence that Ho specifically deprived the asbestos removal firm Alamo of a legitimate commercial job to remove asbestos from the hospital site in accordance with the OSH Act. Ho negotiated with, but did not actually employ, Alamo to perform the licensed abatement. Instead, Ho hired illegal immigrants to remove the asbestos for $1000 each before he ever agreed to Alamo's proposal. This evidence indicates in the context of the OSH Act, similar to what this Court has already analyzed in the context of the CAA, that Ho's asbestos removal activities affected interstate commerce by depriving legitimate commercial asbestos abatement firms of the opportunity to perform the work at the site. Ho's deliberate decision to have unlicensed workers perform the asbestos abatement project sidestepped, and thus supplanted, a commercial firm that operates within the legitimate national market for asbestos removal services, a licensed firm which adheres to OSH Act provisions and regulations. We find Ho's illegal asbestos activities sufficiently affected interstate commerce so as to be subject to the OSH Act. Unlike in **Austin Road**, here the essential fact that Ho's abatement activities affected interstate commerce is not speculative and conclusionary, but rather is established in the record. *See* 683 F.2d at 908.

The Secretary thus met her modest jurisdictional burden under the OSH Act. *See **id.*** at 907. Therefore, on this record, we find

11

substantial evidence exists to support the Commission's factual finding that Ho's activities sufficiently affected interstate commerce to support the OSH Act's jurisdictional reach over Ho as an employer per § 652(5).

**Whether the Commission's factual findings that Ho Ho Ho Express, Inc. and Houston Fruitland, Inc. were not alter egos of Ho to support reverse corporate piercing were supported by substantial evidence.**

In the typical corporate veil piercing scenario, the corporate veil is pierced such that individual shareholders can be held liable for corporate acts. *Maiz v. Virani*, 311 F.3d 334, 346 n.11 (5th Cir. 2002). Here, the purpose of piercing the corporate veils of Ho Ho Ho Express, Inc. and Houston Fruitland, Inc. would be to hold the corporations liable for the acts of their individual shareholder, Ho. *See id.* Therefore, this case presents a "reverse corporate veil piercing" situation. *Id.* "This slight variation is of no consequence, however, because the end result under both views is the same – two separate entities merge into one for liability purposes." *Id.* If alter ego is shown, courts reverse pierce the corporate veil to treat the individual and the corporation as "one and the same." *Zahra Spiritual Trust v. United States*, 910 F.2d 240, 244 (5th Cir. 1990) (citation omitted).

In *Permian Petroleum Co. v. Petroleos Mexicanos*, 934 F.2d 635 (5th Cir. 1991), this Court considered whether a corporate form should be reverse pierced for purposes of a natural gas contract

12

dispute. *Id.* at 643. There, we determined that an alter ego relationship for purposes of reverse veil piercing applies where "there is such unity between corporation and individual that the separateness of the corporation has ceased." *Id.* (citation omitted). Factors involved in this test for an alter ego relationship include:

> [T]he total dealings of the corporation and the individual, including the degree to which corporate formalities have been followed and corporate and individual property have been kept separately, the amount of financial interest, ownership and control the individual maintains over the corporation, and whether the corporation has been used for personal purposes.

*Id.* at 643 (citing *Castleberry v. Branscrum*, 721 S.W.2d 270, 272 (Tex. 1986)). In *Century Hotels v. United States*, 952 F.2d 107 (5th Cir. 1992), we considered whether a family-held corporate form should be reverse pierced for the 26 U.S.C. § 7426 tax liability of an individual family member. *Id.* at 110-112. There, we indicated the reverse veil piercing alter ego analysis depends on the factfinder's weighing of the totality of the circumstances. *Id.* at 110; *see also Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 345 F.3d 347, 359-60 (5th Cir. 2003) (finding legal error where district court failed to consider totality in parent-subsidiary alter ego case); *United States v. Jon-T Chems., Inc.*, 768 F.2d 686, 694 n.8, 696 (5th Cir. 1985) (noting alter ego depends on totality in case where subsidiary company was found to be alter ego of parent company). As the Commission correctly noted, this Circuit has not

13

determined the extent of reverse veil piercing via the alter ego theory in the context of remedial social legislation such as the OSH Act.  However, as a logical application of *Permian* and *Century Hotels*, we agree with the Commission that reverse corporate veil piercing may apply in this context.[3]

"The question of whether to pierce the corporate veil is primarily one of fact and therefore a very deferential standard of review applies."  *Hollowell v. Orleans Regional Hosp. LLC*, 217 F.3d 379, 385 (5th Cir. 2000) (discussing piercing the corporate veil via alter ego theory) (citation omitted); *see also Bridas*, 345 F.3d at 359 (describing alter ego determination as "highly fact-based").  "In reviewing a decision by an administrative agency, we accept all factual findings supported by substantial evidence in the record considered as a whole."  *Austin Road*, 683 F.2d at 908. We are thus bound by the Commission's factual findings on alter ego if they are supported by substantial evidence in the record. *MICA Corp. v. OSHRC*, 295 F.3d 447, 449 (5th Cir. 2002); *See also* 29 U.S.C. § 660(a) (1970) (stating such findings are conclusive).

The Secretary challenges the Commission's finding that the corporate Ho Respondents were not suitable parties for liability

---

[3]We provide no discussion of whether state or federal alter ego law applies in this administrative case not arising under diversity jurisdiction.  *See Century Hotels v. United States*, 952 F.2d 107, 110 n.4 (5th Cir. 1992) (noting "state and federal alter ego tests are essentially the same" and we "apply state and federal cases interchangeably").

under the OSH Act. The Secretary argues Ho used Ho Ho Ho Express and Houston Fruitland as mere business conduits for his illegal asbestos removal activities. The Secretary relies on the alter ego doctrine – that because Ho had control over the corporate Ho Respondents, the limited liability of the corporate form should be "reverse pierced" to hold the corporations liable for the debts of their controlling shareholder. *See* **Century Hotels**, 952 F.2d at 110-12; **Permian**, 934 F.2d at 643. The Secretary focuses on the high ownership shares of Ho in the corporations, approximately 67 percent; the commingling of funds between the corporations and Ho; and the fact that funding for the purchase of the hospital site and payment for the renovation supplies and wages came from the corporations.

Ho Respondents agree with the Commission's findings that the corporate Ho Respondents were not the alter egos of Ho to support reverse piercing them for the purpose of imposing liability. Ho Respondents argue that substantial evidence supports the Commission's factual findings that the corporate Ho Respondents did not engage in the asbestos removal activities at issue and were not the employers of the workers at the site. Also, Ho Respondents stress the Commission was correct in finding Ho's corporations were legitimate operating entities on their own.

Ho Respondents concede that a Ho Ho Ho Express truck was parked once at the worksite, and Ho did engage in corporate

15

borrowing between the entities.  However, Ho Respondents stress that all the respective corporate accounts and ledgers were legitimately debited and credited for each borrowing transaction. Moreover, the corporate Ho Respondents did not provide any employees to the site.  Ho Respondents thus contend the Commission correctly reviewed the totality of the facts to determine that there was no alter ego relationship here. *See **Jon-T Chems.**.*, 768 F.2d at 692.  Ho Respondents maintain reverse piercing was not warranted because it is clear here that Ho and the corporate Ho Respondents could not be treated as "one and the same." *See **Zahra***, 910 F.2d at 243-44.  Ho Respondents point out there is no evidence that the corporate Ho Respondents were operated in a manner indistinguishable from Ho's personal affairs.

The Commission employed the proper legal standard for reverse corporate piercing based on alter ego because it considered the totality of the **Permian** factors in Ho's case. *See **Bridas***, 345 F.3d at 359-60 (finding legal error because the district court's determination of no alter ego was based solely on corporate formalities).  Thus, we determine whether the Commission's factual findings that Houston Fruitland and Ho Ho Ho Express should not be considered as alter egos of Ho under that totality were supported by substantial evidence.  After a thorough review of the record, we conclude that they were.  The Secretary's contention that Ho Ho Ho Express and Houston Fruitland were "nothing more than incorporated

16

pocketbooks for Ho's personal use" is unfounded. Although Ho clearly involved some of the corporate entities' finances in his hospital project, the record evidence indicates that Ho as the individual in charge of this particular renovation project remained distinct from the corporate Ho Respondents as ongoing, formalized fruit sale and delivery entities.

While there is evidence that Ho played a role in the corporate Ho Respondents' day-to-day operations, and Ho's personal assistant employed by Ho Ho Ho Express ran some errands for Ho concerning the renovation project, Houston Fruitland and Ho Ho Ho Express still maintained entirely separate corporate identities, tax identities, bank accounts, and legitimate business operations. This is not a case such as *Century Hotels* where payment of a family shareholder's personal expenses, funding of his son's checking account, and ownership of the personal family residence could directly be traced back to the family companies. 952 F.2d at 111-12. There, "the patterns of dealing among the Smith family companies" distinctly showed "[use of] the corporate form for illegitimate ends." *Id.* at 112. In contrast, the record evidence here indicates that the corporate Ho Respondents had a limited financial stake in Ho's renovation project, not that they functioned as his alter egos on the renovation project.

Although Ho borrowed from the corporate Ho Respondents for financing of the hospital project, an admittedly personal pursuit,

17

the record evidence indicates distinct debit ledger entries and some repayment to the corporations by Ho. This fact also distinguishes Ho's case from *Century Hotels*. *See* 952 F.2d at 111 n.12 (noting the lack of evidence of "loan" repayment). Moreover, there is no evidence that the corporate entities were ever treated or confused as one and the same with the individual Ho or his personal dealings. Admittedly, here, the alter ego question is not as readily resolved as in *Century Hotels*. However, to affirm the Commission's findings on alter ego, this Court need only look for "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolo*, 383 U.S. at 619-20 (citation omitted).

We find substantial evidence in the record adequately supporting that the totality of the factors under the *Permian* alter ego test did not indicate "such unity between corporation[s] and individual that the separateness of the corporation[s] ha[d] ceased." 934 F.2d at 643 (citation omitted). Therefore, this Court is bound by the Commission's findings that Ho Ho Ho Express and Houston Fruitland were not alter egos of Ho to support reverse corporate piercing.

**Whether the Commission's legal conclusion that Ho did not willfully violate the general duty clause, § 654(a)(1), of the OSH Act, was arbitrary, capricious, an abuse of discretion, or not in accordance with law.**

Section 654(a)(1) of the OSH Act requires employers to free their workplaces of "recognized hazards that are causing or are

18

likely to cause death or serious physical harm to . . . employees."
29 U.S.C. § 654(a)(1) (1970).[4]  The specific general duty citation
here arose from the explosion of natural gas released by tapping an
unmarked valve.  A willful violation is one committed voluntarily,
with either intentional disregard of, or plain indifference to, OSH
Act requirements.  *Georgia Elec. Co. v. Marshall*, 595 F.2d 309, 318
(5th Cir. 1979).  "'Willful' means action taken knowledgeably by
one subject to the statutory provisions in disregard of the
action's legality."  *Id.* at 317 (quoting *Intercounty Constr. Co. v.
OSHRC*, 522 F.2d 777, 779-80 (4th Cir. 1975)).  In contrast, "[t]he
gravamen of a serious violation is the presence of a 'substantial
probability' that a particular violation could result in death or
serious physical harm."  *Id.* at 318.  The employer's intent to
violate an OSH Act standard is irrelevant to find a serious
violation.  *Id.*  The Commission's legal conclusions can only be set
aside if they are arbitrary, capricious, an abuse of discretion, or
not in accordance with law.  *MICA Corp.*, 295 F.3d at 449 (citation
omitted).

The Secretary argues the Commission's finding that Ho's

---

[4]The general duty clause of the OSH Act provides, in part:

(a) Each employer--
(1) shall furnish to each of his employees employment and a
place of employment which are free from recognized hazards
that are causing or are likely to cause death or serious
physical harm to his employees . . . .

29 U.S.C. § 654(a)(1) (1970).

19

violation of § 654(a)(1) was not willful was based on an erroneous legal standard requiring direct evidence of Ho's state of mind. The Secretary contends Ho demonstrated plain indifference in directing Tate to tap into the unmarked pipeline in an attempt to procure water for washing the building. According to the Secretary, this was a clear violation of the stop-work order Ho received in February. Therefore, the Secretary maintains Ho knew tapping into the pipeline without approval was illegal, even if he may not have known of the specific explosion hazard or that it was a violation of the general duty clause of the OSH Act. The Secretary argues direct evidence of Ho's state of mind was not required because proof of Ho's plain indifference to legal requirements in general was clearly established.

Ho Respondents reply that the Commission was correct to find that the Secretary had not met her burden of proof in showing Ho's violation as rising to the intent of willful. Ho Respondents maintain the Commission applied the correct legal standard, and substantial evidence on the record supports its decision that the § 654(a)(1) violation was not willful. Ho respondents argue the Commission's reference to direct evidence amounted to a recognition that the Secretary had not put forth any evidence relevant to the specific circumstances of the violation in question. Ho Respondents emphasize that the Secretary did not put forth any evidence of Ho's state of mind to show that he had a heightened awareness that instructing Tate to open the valve might be

20

hazardous or that Ho consciously disregarded a known safety hazard related to the valve – that is, for this action to meet a showing of either intentional disregard of the OSH Act or plain indifference to employee safety. Ho Respondents stress there was no evidence directed to the intent accompanying this particular incident.

The Secretary argues that Ho's action here was part of a consistent illegal and voluntary course of conduct; all his actions were plainly indifferent to employee safety. However, although there may be evidence of a conscious pattern of illegal work practices by Ho with regard to the asbestos abatement, the challenged violation of the general duty clause does not concern Ho's many asbestos transgressions covered specifically by OSH Act regulations. *See Reich v. Arcadian Corp.*, 110 F.3d 1192, 1196 (5th Cir. 1997). In particular, it related to an employee being required to open a pipe of unknown content. Here, the Secretary presented no evidence relevant to Ho's state of mind on, or recognition of the hazards of, this particular action to direct Tate to open the unmarked valve. We thus agree with the Commission that plain indifference as to this specific hazardous action cannot be inferred, even from Ho's several OSH Act violations concerning the asbestos removal project.

Though the evidence need not indicate "bad purpose" or "evil motive" to commit a particular act, *Georgia Elec. Co.*, 595 F.2d at

319 n.23, there must be evidence of that "extra ingredient needed for willfulness, either the element of intentional disregard or plain indifference." *Id.* at 318 n.22 (internal quotation marks omitted). None existed in this record. Though Ho's pattern of illegal work practices may have been conscious, and his asbestos-related OSH Act violations found to be willful, this does not compel a finding of willfulness as to his specific instruction to open the unmarked valve. *See id.* Therefore, because the Commission's legal determination as to Ho's lack of willfulness under § 654(a)(1) was neither arbitrary, capricious, nor an abuse of discretion, and accords with law, we accept its conclusion.

**Whether the citations against Ho should have been assessed on a per-employee or per-instance basis.**

The Secretary's discretion to cite multiple violations of an OSH Act standard is restricted "to those standards which are capable of such interpretation." *Sec. of Labor v. The Hartford Roofing Co., Inc.*, 1995 WL 555498, at *6 (O.S.H.R.C.). "The test of whether the [OSH] Act and the cited regulation permits multiple or single units of prosecution is whether they prohibit individual acts, or a single course of action." *Sec. of Labor v. Caterpillar, Inc.*, 1993 WL 44416, at *22 (O.S.H.R.C.) (citation omitted). "With few exceptions, the Commission has not affirmed multiple violations for violations of the same standard, or affirmed separate violations or penalties on a per employee exposed basis." *Id.* at

22

*23. The Commission here determined that the plain language of the training and respirator subsections of the asbestos standard at issue prescribed a single work practice instead of conduct unique and specific to each employee. It thus only affirmed one training and one respirator citation against Ho.

The Secretary argues the per-employee citations for asbestos training and respirator violations, with which she charged Ho Respondents, should have been affirmed by the Commission. The Secretary maintains that each time an employer commits a prohibited act or allows a prohibited condition to exist, the employer violates the OSH Act. The Secretary contends the Commission's analysis ignores the standards' plain language and the established test for determining which conditions or actions constitute separate violations under the OSH Act, as enunciated in the Commission's own prior cases and in this Court's caselaw. The Secretary insists the Commission also ignored basic precepts of prosecutorial discretion.

The Secretary argues that if a standard prohibits individual acts or conditions, the standard is violated each time the prohibited act or condition occurs. *See* **Sec. of Labor v. Andrew Catapano Enters., Inc.**, 1996 WL 559899, at *9-10 (finding each location at site where shoring in trench to prevent cave-in was not installed was violation of 29 C.F.R. § 1926.652(b)); **Sec. of Labor v. J.A. Jones Constr. Co.**, 1993 WL 61950, at *14 (O.S.H.R.C.)

23

(finding each location at site lacking fall protection was violation of 19 C.F.R. § 1926.500); *Caterpillar*, 1993 WL 44416, at *22-23 (finding each employer failure to record an employee's injury or illness on its OSHA log was violation of 29 C.F.R. § 1904.2(a)); *Sec. of Labor v. Hoffman Constr. Co.*, 1978 WL 6990, at *1 (O.S.H.R.C.) (finding each failure to erect a guardrail on scaffolding was violation of 29 C.F.R. § 1926.451(a)(4)).

The general construction training standard, 29 C.F.R. § 1926.21(b)(2),[5] which requires employers to "instruct each employee in the recognition and avoidance of unsafe conditions," has been interpreted as being citable on a per-employee basis. *Catapano*, 1996 WL 559899, at *4-5. Portions of the lead standard have also been interpreted as permitting per-employee citations because the standard's medical removal subsection, 29 C.F.R. § 1910.1025(k)(1)(i)(D),[6] and respirator fit-test subsection, 29

_____

[5]Section 1926.21, Safety training and education, provides, in part:

(b) Employer responsibility.
...
(2) The employer shall instruct each employee in the recognition and avoidance of unsafe conditions and the regulations applicable to his work environment to control or eliminate any hazards or other exposure to illness or injury.

29 C.F.R. § 1926.21(b)(2) (1989).

[6]Section 1910.1025, Lead, provides, in part:

(k) Medical Removal Protection.
(1) Temporary medical removal and return of an employee.
(i) Temporary removal due to elevated blood lead levels.

24

C.F.R. § 1910.1025(f)(3)(ii),[7] required evaluation of individual employees. *Sec. of Labor v. Sanders Lead Co.*, 1995 WL 242606, at *3, *6 (O.S.H.R.C.). *But see* **Arcadian**, 110 F.3d at 1196-99 (finding general duty clause of OSH Act directed at hazardous conditions did not allow per-employee citations but noting that worker training or removal standards could count each employee as the unit of violation); *Hartford Roofing*, 1995 WL 555498, at *6-7

---

...
(D) Fifth year of the standard, and thereafter. Beginning with the fifth year following the effective date of the standard, the employer shall remove an employee from work having an exposure to lead at or above the action level on each occasion that the average of the last three blood sampling tests conducted pursuant to this section (or the average of all blood sampling tests conducted over the previous six (6) months, whichever is longer) indicates that the employee's blood lead level is at or above 50 micrograms per 100 g of whole blood; provided, however, that an employee need not be removed if the last blood sampling test indicates a blood lead level at or below 40 micrograms per 100 g of whole blood.

29 C.F.R. § 1910.1925(k)(1)(i)(D) (1986).

[7]Section 1910.1025, Lead, provides, in part:

(f) Respiratory protection.
...
(3) Respirator usage.
...
(ii) Employers shall perform either quantitative or qualitative face fit tests at the time of initial fitting and at least every six months thereafter for each employee wearing negative pressure respirators. The qualitative fit tests may be used only for testing the fit of half-mask respirators where they are permitted to be worn, and shall be conducted in accordance with Appendix D. The tests shall be used to select facepieces that provide the required protection as prescribed in table II.

29 C.F.R. § 1910.1025(f)(3)(ii) (1986).

25

(finding one unguarded roof edge requiring warning was single violation of 29 C.F.R. § 1926.500(g)(1)(i) and § 1926.500(g)(4) no matter how many employees were exposed to a fall but noting that the respirator protection standard, 29 C.F.R. § 1910.134, could count a separate violation as to each employee not provided a respirator). Neither the Secretary nor Ho Respondents advance any Fifth Circuit or Commission precedent interpreting the asbestos standard.

As to training violations, the Secretary maintains that Ho violated § 1926.1101(k)(9)(i) and (viii)[8] of the asbestos regulations each time he assigned a worker to remove asbestos without providing the worker with individual training about the hazards of asbestos removal and about the required safeguards against those hazards. The Secretary bases this argument on the

_____

[8]Section 1926.1101, Asbestos, provides, in part:

(k) Communication of hazards.
...
(9) Employee Information and Training.
(i) The employer shall, at no cost to the employee, institute a training program for all employees who are likely to be exposed in excess of a PEL and for all employees who perform Class I through IV asbestos operations, and shall ensure their participation in the program.
...
(viii) The training program shall be conducted in a manner that the employee is able to understand. In addition to the content required by provisions in paragraphs (k)(9)(iii) through (vi) of this section, the employer shall ensure that each such employee is informed of the following:
....

29 C.F.R. § 1926.1101(k)(9)(i) and (viii) (1997).

26

plain language of the regulation:  employers are to conduct the training program "in a manner the employee is able to understand . . . [so] that each such employee is informed."  29 C.F.R. § 1926.1101(k)(9)(viii) (1997).  According to the Secretary, this language requires tailoring the training to each individual employee's characteristics and comprehension, not to mention language skills and hire date.  The Secretary argues *Arcadian*, 110 F.3d at 1199, supports this reading of the regulation.  Also, the Secretary notes *Catapano* reached a per-employee result with the analogous general construction training standard.  1996 WL 559899, at *4-5.

As to respirator violations, the Secretary points again to the plain language of § 1926.1101(h)(1)(i):  "[t]he employer shall provide respirators, and ensure that they are used . . . [d]uring all Class I asbestos jobs."  29 C.F.R. § 1926.1101(h)(1)(i) (1997).[9]  The Secretary notes that this standard goes on in later subsections to explain that each employee is to be provided an appropriate, approved, properly fitted respirator.  *See* *id.* §

---

[9]Section 1926.1101, Asbestos, provides, in part:

(h) Respiratory protection.
(1) General.  The employer shall provide respirators, and ensure that they are used, where required by this section. Respirators shall be used in the following circumstances:
(i) During all Class I asbestos jobs.

29 C.F.R. § 1926.1101(h)(1)(i) (1997).

27

1926.1101(h)(2)(iii) (allowing employee to choose air-purifying versus negative-pressure respirator); *id.* § 1926.1101(h)(4)(i) and (ii) (mandating fit tests to ensure least possible faceplate leakage). As with the individualized training sessions, the Secretary argues each of Ho's 11 employees required a personally fitted respirator that the employee had chosen. Thus, Ho was required to take employee-specific actions. Again, the Secretary cites **Arcadian**, 110 F.3d at 1199. The Secretary also relies on **Sanders Lead**, 1995 WL 242606, at *6, which discussed the lead respirator fit-testing standard. *See also* **Hartford Roofing**, 1995 WL 555498, at *7 (noting that the respirator protection standard could be counted as a separate violation for each employee not provided a respirator).

In addition, the Secretary maintains the Commission used a flawed analysis to interpret the training and respirator regulations. The Secretary argues a training program is meaningless unless implemented on an individual basis. Likewise, Ho was required to give each worker an individual respirator. This was not a single, discrete act, but rather required initial fitting and then periodic refitting for each worker. The Secretary suggests a nonsensical reading would ensue if an employer not providing any respirators, like Ho, resulted in only one violation, while an employer who provided them but did not fit-test them received per-employee citations.

28

Finally, the Secretary argues that even if the standards were ambiguous, the Secretary's per-employee construction was reasonable and entitled to deference. That is, it sensibly conformed to the purpose and wording of the regulations. *See* **Martin v. OSHRC**, 499 U.S. 144, 150-51 (1991). The Secretary contends the Commission incorrectly failed to defer to the reasonableness of the Secretary's interpretation. The Commission claimed the Secretary failed to raise it, but the Secretary responds she was not so required because she was only defending Ho's appeal of the ALJ's decision. And the Secretary notes Ho raised no deference challenge. The Secretary argues the Commission could not choose its own interpretation of the regulatory language where hers was reasonable. *See* **id.** at 158. The Secretary maintains the Commission also improperly concluded the Secretary's decisions on this issue had not been consistent and that in any event Ho did not have fair notice that these standards could be assessed on a per-employee basis. Moreover, the Secretary contends Ho had to affirmatively plead and prove lack of fair notice, which claim he did not even raise.

Ho Respondents agree with the Commission's treatment of the plain language of the respirator and training regulations. Ho Respondents argue the Secretary's position that she can choose to issue citations on a per-employee basis as opposed to a per-violation basis is not supported by the language of the standards.

29

Ho Respondents contend such plain language cannot be expanded under the guise of interpretation. Ho Respondents stress the Commission properly vacated the 20 citations that were entirely duplicative, except as to the name of the worker involved. Ho Respondents rely on *Arcadian*, 110 F.3d at 1193-94, 1196, as prohibiting the very kind of per-employee citations and penalties the Secretary wants to impose on them. Ho Respondents argue the language in the OSH Act general duty clause at issue in *Arcadian* is substantially similar to that in the respirator and training regulations at issue here.

Ho Respondents contend it is violative employer conduct or a violative condition, as opposed to the number of employees, that is the proper unit of prosecution. Ho Respondents also argue the Secretary's position is not to be accorded deference because the regulations are unambiguous and thus applied not per employee, but rather per violation. Even if the language were ambiguous, Ho Respondents maintain the Secretary's per-employee interpretation is not reasonable because the Secretary used a punitive citation here to publish her inconsistent interpretation of the standard. Ho Respondents argue the Secretary's per-employee citations are not in accordance with law because they were beyond the scope of her authority pursuant to the OSH Act and are not entitled to deference because they were neither consistent with the language of the standards nor consistently applied.

After reviewing the arguments advanced by the parties, we

30

agree with the Commission's result that the training and respirator citations cannot be imposed per employee here.  As to the asbestos respirator standard, we fully agree with the Commission's reasoning.  However, as to the asbestos training standard, we affirm the Commission's result for different reasoning.

Asbestos training standard, 29 C.F.R. § 1926.1101(k)(9)(i) and (viii).

To begin, we find this standard's language ambiguous.  Thus, unlike the Commission, which found the standard to be stated solely in inclusive terms, we agree with the Secretary that the language of the asbestos training standard allows the Secretary, in her discretion, to reasonably assess penalties on a per-employee basis.

Subpart (i) expressly refers to "a training program for all employees" performing Class I asbestos work and also speaks to the employer's requirement to "ensure their participation in the program," which language tends to indicate that one training program is to be provided for all employees as a unit and does not appear to make allowance for a per-employee assessment.  29 C.F.R. § 1926.1101(k)(9)(i) (1997).  However, although subpart (viii) again refers to the singular "training program," it also goes on to state that the program "shall be conducted in a manner the employee is able to understand" and that the employer "shall ensure that each such employee is informed of the following."  *Id.* § 1926.1101(k)(9)(viii).

These express references to the ability of the employee to

31

understand and to "each such employee" being informed implicate the possibility that on an individual basis, employees may need distinct, discrete information not provided to "each such" other employee, perhaps due to differences in experience, language, and job skills. Although this Court has treated the reference to "each of his employees" in the general duty clause of the OSH Act to be entirely inclusive, this reading was made in the context of § 654(a)(1) being a "catchall provision" governing any recognized hazards of the workplace *not* covered by a specific regulation. *Arcadian*, 110 F.3d at 1196 (citation omitted). There is a distinction when reading the specific asbestos training regulation, which does not have a "principal focus on hazardous conditions" such that "each" is only used to clarify that the employer's duty runs to all employees, "regardless of their individual susceptibilities (i.e., age or pregnancy)." *Id.* at 1198.

In contrast, subpart (viii) of the asbestos training standard instructs employers that the training program must be conducted in such a way that the employees understand and are informed of various asbestos-related hazards. *See* 29 C.F.R. § 1926.1101(k)(9)(viii) (1997). Whether an employee understands and is informed by a training program, as the regulation requires, may depend on his "individual susceptibilities." *See* **Arcadian**, 110 F.3d at 1198. Thus, considering the interaction of the two subparts (i) and (viii) of the asbestos training standard together,

32

we agree with the Secretary that § 1926.1101(k)(9) is ambiguous and therefore can be interpreted to allow for citation on a per-employee basis.

However, we find the Secretary's discretionary decision to cite Ho on a per-employee basis on these facts was unreasonable. In *Martin*, the Supreme Court explained the division of powers between the Secretary and the Commission under the OSH Act. 499 U.S. at 157-58. As a reviewing court, we "should defer to the Secretary only if the Secretary's interpretation *is* reasonable." *Id.* at 158 (emphasis in original). Thus, under *Martin*, after determining that a standard is ambiguous, we must perform an assessment of the reasonableness of the Secretary's view to determine whether we must defer to it over the Commission's competing interpretation in a particular case. *Id.* at 150, 159. In this way, we are authorized by Congress to "protect regulated parties from biased interpretations of the Secretary's regulations." *Id.* at 156. "The Secretary's interpretation of an ambiguous standard is subject to the same standard of substantive review as any other exercise of delegated lawmaking power." *Id.* at 158 (citing 5 U.S.C. § 706(2)(A)). That is, the Secretary's interpretation is not reasonable, and this Court can hold it unlawful and set it aside, if we find such interpretation to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1996).

33

We note first that this case does not present any employee-specific unique circumstances that could merit citation based on each failure to train an individual employee. *See, e.g, **Catapano***, 1996 WL 559899, at *5 (vacating duplicative training citations because of a lack of different circumstances). Here, the training citations merely tracked the language of subpart (i), referring to Ho as employer not instituting "a training program for all employees," and of subpart (viii), referring to Ho as employer not ensuring his employees were informed of the items listed in subpart (viii). There was no indication as to how one citation may have been distinct from the next. Moreover, as in ***Arcadian***, all the cited violations were identical to each other, except for the name of the hospital site worker. *See* 110 F.3d at 1194; *see also* ***Catapano***, 1996 WL 559899, at *5 (noting the citations were identical, except for the date). *But see also* ***Arcadian***, 110 F.3d at 1198-99 (indicating in dictum that although "generally unavailable," "[a]n employee could be a unit of violation" "if the regulated condition or practice is unique to the employee").

Nothing in this record indicates that one training program regarding this Class I asbestos removal at the hospital site would not have abated the violation of both subparts (i) and (viii), nor that unique individual training sessions, or even more than one session, would have been necessary to abate the violation. The ALJ indicated that one training session, if all 11 workers had

34

attended, would have been sufficient to meet the training standard here. The citations and evidence support that this was one Class I asbestos removal job on a single site at one address, performed by all the same 11 untrained workers, from the beginning to the end. Thus, although we acknowledge that there may be cases where per-employee citations of § 1926.1101(k)(9) based on unique circumstances of the employees might be considered reasonable, here we do not defer to the Secretary's unreasonable interpretation of the asbestos training regulation as applied to Ho. As the Commission's interpretation of the standard here was reasonable as applied to Ho's case, we affirm its assessment of one citation instead of 11 individual citations.

Asbestos respirator standard, 29 C.F.R. § 1926.1101(h)(1)(i).

Unlike the asbestos training standard, we read the plain language of the portion of the respirator standard for which Ho was cited as not allowing the Secretary the discretion to charge employers with per-employee citations. The regulation states: "The employer shall provide respirators, and ensure that they are used . . . [d]uring all Class I asbestos jobs." 29 C.F.R. § 1926.1101(h)(1)(i) (1997). The Secretary makes the seemingly logical argument that it makes little sense for a malicious employer who provides no respirators at all to be eligible for fewer violations than an employer who in good faith provides respirators but fails to comply with other subparts of the asbestos respirator standard governing the employee's ability to choose his

35

type of respirator and periodic fit-testing requirements. However, there is simply no language in the general respiratory protection section that suggests the unit of prosecution could be based on each individual employee not receiving a respirator versus the employer's course of action in failing to provide respirators to his employees as a whole for the Class I asbestos job. Instead, we read the unit of prosecution for violating this standard as applying per Class I asbestos job. *See **Hartford Roofing***, 1995 WL 555498, at *5 ("[W]here a single practice, method or condition affects multiple employees, there can only be one violation of the standard."). Here, the evidence indicates that Ho engaged in one Class I asbestos removal job at one hospital site for one sustained period of time.

In contrast, language in other parts of the asbestos respirator standard suggests citation on a per-employee basis might be appropriate. Subsection (h)(2)(iii) of the asbestos respirator standard contains language directing employers to provide an air-purifying respirator instead of a negative-pressure respirator to employees, but only when "[a]n employee chooses to use this type of respirator." 29 C.F.R. § 1926.1101(h)(2)(iii)(A)(1).[10] A violation

_____

[10]Section 1926.1101, Asbestos, provides, in part:

(h) Respiratory protection.
. . .
(2) Respirator selection.
. . .
(iii)(A) The employer shall provide a tight fitting powered,

could be counted each time the employer did not provide the chosen type of respirator to the individual employee who requested it. Likewise, subsection (h)(4)(i) mandates the employer to "ensure that the respirator issued to the employee exhibits the least possible faceplate leakage and that the respirator is fitted properly." *Id.* § 1926.1101(h)(4)(i).[11] This language properly applies to the unique circumstances of an individual employee; a violation could be counted as to each employee whose faceplate exhibited more than the least possible leakage and was not properly fitted at the time of issuance. Violations of subsection (h)(4)(ii) mandating qualitative or quantitative fit-tests to be performed at the initial fitting and every six months afterward also could be appropriately assessed for each employee who did not receive such periodic testing.[12] Indeed, an employer potentially

---

air-purifying respirator in lieu of any negative-pressure respirator specified in Table 1 whenever:
(1) An employee chooses to use this type of respirator . . . .

29 C.F.R. § 1926.1101(h)(2)(iii)(A)(1) (1997).

[11]Section 1926.1101, Asbestos, provides, in part:

(h) Respiratory protection.
. . .
(4) Respirator fit testing.
(i) The employer shall ensure that the respirator issued to the employee exhibits the least possible facepiece leakage and that the respirator is fitted properly.

29 C.F.R. § 1926.1101(h)(4)(i) (1997).

[12]Section 1926.1101, Asbestos, provides, in part:

could be cited *multiple times per employee* under subpart (ii) if multiple semiannual periods passed without the required fit-testing. Thus, while the latter subsections of the asbestos respirator standard require employee-specific action by the employer, none of the above employee-specific language is implicated in subsection (h)(1)(i) governing general provision of respirators to Class I asbestos workers. This general subsection plainly addresses employees in the aggregate.

While we agree with the Secretary that in dicta in **Arcadian** we stated that per-employee citation may be appropriate in certain cases "only if the regulated condition or practice was unique to the individual," 110 F.3d at 1198-99, again, the precise issue there was neither the asbestos respirator standard nor any respirator standard at all. As for the Secretary's reliance on

---

(h) Respiratory protection.
. . .
(4) Respirator fit testing.
. . .
(ii) Employers shall perform either quantitative or qualitative face fit tests at the time of initial fitting and at least every 6 months thereafter for each employee wearing a negative-pressure respirator. The qualitative fit tests may be used only for testing the fit of half-mask respirators where they are permitted to be worn, or of full-facepiece air purifying respirators where they are worn at levels at which half-facepiece air purifying respirators are permitted. Qualitative and quantitative fit tests shall be conducted in accordance with Appendix C to this section. The tests shall be used to select facepieces that provide the required protection as prescribed in Table 1 in paragraph (h)(2)(i) of this section.

29 C.F.R. § 1926.1101(h)(4)(ii) (1997).

*Sanders Lead*, there the Commission interpreted not the section of the lead respirator standard governing general provision of respirators to employees, *see* 29 C.F.R. § 1910.1025(f)(1),[13] but rather the fit-testing subsection, 29 C.F.R. § 1926.1025(f)(3)(ii).[14] 1995 WL 242606, at *6. "[T]he respirator fit-test standard requires the evaluation of individual employees' respirators under certain unique circumstances peculiar to each employee." *Id.* As we indicated above, the fit-test portion of the asbestos respirator standard similarly provides for per-employee assessment of violations. *See* 29 C.F.R. § 1926.1101(h)(4)(ii). Finally, in *Hartford Roofing*, although the Commission indicated there may be per-employee assessment of violations of the respiratory protection standard, 29 C.F.R. § 1910.134, such statement was made in dicta, as the precise issue was whether the Secretary could cite a separate violation of 29 C.F.R. § 1926.500(g)(1)(i)[15] and § 1926.500(g)(4)[16] for each employee exposed

_____

[13]Section 1910.1025, Lead, provides, in part:

(f) Respiratory protection.
(1) General. Where the use of respirators is required under this section, the employer shall provide, at no cost to the employee, and assure the use of respirators which comply with the requirements of this paragraph. Respirators shall be used in the following circumstances . . . .

29 C.F.R. § 1910.1025(f)(1) (1986).

[14]*See* n.7.

[15]Section 1926.500, Guardrails, handrails, and covers, provides, in part:

39

to an unguarded roof edge. 1995 WL 555498, at *6-7, *10 (affirming the ALJ's assessment of one citation where the Secretary had issued one for each of six employees). Moreover, the respiratory standard mentioned in **Hartford Roofing** related not to asbestos or lead, but rather to general industry, shipyards, marine terminals, longshoring, and construction. *See* 29 C.F.R. § 1910.134 (1992). In those work zones, widespread use of respirators is not required, but rather depends on the precise atmospheric conditions, when it becomes necessary to protect the employees' health. *See **id.***

After considering the plain language of subsection (h)(1)(i)

---

(g) Guarding of low-pitched roof perimeters during the performance of built-up roofing work.
(1) General provisions. During the performance of built-up roofing work on low-pitched roofs with a ground to eave height greater than 16 feet (4.9 meters), employees engaged in such work shall be protected from falling from all unprotected sides and edges of the roof as follows:
(i) By the use of a motion-stopping-safety system (MSS system)
. . . .

29 C.F.R. § 1926.500(g)(1)(i) (1992).

[16]Section 1926.500, Guardrails, handrails, and covers, provides, in part:

(g) Guarding of low-pitched roof perimeters during the performance of built-up roofing work.
. . .
(4) Mechanical equipment. Mechanical equipment may be used or stored only in areas where employees are being protected by either a warning line or an MSS system. Mechanical equipment may not be used or stored between the warning line and the roof edge unless the employees are being protected by an MSS system. Mechanical equipment may not be used or stored where the only protection provided is by a safety monitoring system.

29 C.F.R. § 1926.500(g)(4) (1992).

40

of the asbestos respirator standard, we agree with the Commission and find that the regulation does not provide for the assessment of citations on a per-employee basis, but rather on the basis of an employer's course of conduct in failing to provide respirators to his employees during a Class I asbestos job. Thus, Ho's failure to provide respirators to all 11 workers at the hospital site for the single Class I asbestos removal project was a single violation of the respirator regulation. Therefore, we affirm the Commission's assessment of one violation of § 1926.1101(h)(1)(i).[17]

**Whether the Commission abused its discretion in imposing the maximum penalties for Ho's OSH Act violations.**

The Commission has the exclusive authority to assess penalties once a proposed penalty is contested. *Arcadian*, 110 F.3d at 1199. Section 17(j) of the OSH Act, 29 U.S.C. § 666(j), guides the Commission's assessment of a penalty. *Id.*; *J.A. Jones*, 1993 WL 61950, at *15. The Commission is to "giv[e] due consideration to the appropriateness of the penalty with respect to [1] the size of the business of the employer being charged, [2] the gravity of the violation, [3] the good faith of the employer, and [4] the history of previous violations." 29 U.S.C. § 666(j) (1990). "These factors are not necessarily accorded equal weight . . . ." *J.A.*

---

[17]We pause to note that the instant result does not foreclose the possibility of a different result if an employer refuses to provide respirators to his employees for multiple and distinct Class I asbestos jobs; then each of those violations could be separately cited by the Secretary.

*Jones*, 1993 WL 61950, at *15.  Gravity of violation is the key factor.  *See* *id.*  The Commission can, when appropriate, consider the number of employees exposed to the condition when analyzing gravity.  *Arcadian*, 110 F.3d at 1199.  This Court reviews the Commission's determination of the amount of an OSH Act penalty for abuse of discretion.  *Shaw Constr., Inc. v. OSHRC*, 534 F.2d 1183, 1185 (5th Cir. 1976).

Ho Respondents argue that the Commission abused its discretion in failing to consider each of the four elements set forth in § 666(j) in its determination of the amounts of penalties to assess. Ho Respondents maintain it was an abuse of discretion to consider Ho's bad faith alone because all four factors are equally important.

The Secretary responds that the Commission did not err in assessing the maximum penalty for the two violations of the asbestos training and respirator standards it affirmed.  The Secretary argues the Commission gave proper consideration to the statutory penalty criteria but concluded that Ho's extreme and appalling disregard for employee safety – his lack of good faith – outweighed other considerations in the context of this case.

After vacating 20 of the 22 asbestos training and respirator standard citations, the Commission increased the remaining willful penalties to the maximum $70,000 each and the serious penalties to the maximum $7000 each to make a strong statement about Ho's

42

illegal behavior. To be sure, the Commission rested much of its decision on Ho's lack of good faith. The Commission also, however, addressed the gravity of Ho's violations; it considered the number of employees he exposed to the cited conditions to be a significant indication of gravity. While this inquiry is a factor-based balancing test, there is no requirement of equal consideration of all factors. *See **J.A. Jones**,* 1993 WL 61950, at *15. The Commission expressly considered and weighed Ho's lack of good faith and the gravity of the violations. Based on the circumstances present in Ho's particular case, we find the Commission did not abuse its discretion in assessing the maximum penalty amounts.

## CONCLUSION

Having carefully considered the record of the case and the parties' respective briefing and arguments, for the reasons set forth above, we AFFIRM the Commission's decision.

**AFFIRMED.**

EMILIO M. GARZA, Circuit Judge, dissenting:

Because the majority opinion fails to defer to the Secretary of Labor's ("Secretary") reasonable interpretations of the ambiguous language of 29 C.F.R. § 1926.1101(h)(1) and 29 C.F.R. § 1926.1101(k)(9); incorrectly finds that the Ho Ho Ho Express and Houston Fruitland (collectively, "Ho Entities") are not Erik Ho's ("Ho") alter egos; and holds that Ho's instruction to tap an unmarked pipe was a "serious" rather than "willful" violation of the General Duty Clause, 29 U.S.C. § 654(a)(1), I respectfully dissent.

I

The majority opinion holds that the language of 29 C.F.R. § 1926.1101(h)(1) *unambiguously* precludes per-employee citations and, thus, affirmed the Commission's ruling that the regulation does not require an individualized duty but instead applies to a single course of conduct. The majority opinion also finds that the language of 29 C.F.R. § 1926.1101(k)(9))which the Commission determined addresses a single course of conduct, prohibiting per-employee citations))is ambiguous; however, it holds that the Secretary's interpretation is unreasonable and, hence, that the per-employee citations are prohibited. I disagree. The language of both provisions is ambiguous, and the majority opinion fails to defer to the Secretary's reasonable interpretation allowing per-

employee citations.

The penalty provisions of the OSH Act permit penalties on a per-violation basis. *Kaspar Wire Works, Inc. v. Sec'y of Labor*, 268 F.3d 1123, 1130 (D.C. Cir. 2001). The question, however, is what constitutes a *unit* of violation. "The test of whether the Act and the cited regulation permits multiple or single units of prosecution is whether they prohibit individual acts, or a single course of action." *Sec'y of Labor v. Caterpillar Inc.*, No. 87-0922, 1993 WL 44416, at *22 (O.S.H.R.C. Feb. 5, 1993). An example of a single course of action is the failure to protect the perimeter of a roof. *Sec'y of Labor v. Hartford Roofing Co.*, No. 92-3855, 1995 WL 555498 (O.S.H.R.C. Sept. 15, 1995). The failure to erect guardrails on multiple scaffolds, however, may be cited on a per-instance basis. *Sec'y of Labor v. Hoffman Constr. Co.*, No. 4182, 1978 WL 6990 (O.S.H.R.C. Jan. 4, 1978). Individual record-keeping violations may be penalized on a per-instance basis. *Caterpillar*, 1993 WL 44416, at *23. Failure to remove employees from work who were exposed to lead at or above the action level may be cited on a per-employee basis. *Sec'y of Labor v. Sanders Lead Co.*, No. 87-260, 1995 WL 242606, at *3 (O.S.H.R.C. Apr. 24, 1995). "It is not the single decision by an employer . . ., but the language of the standard that is determinative." *Id.*

When the statutory language is not clear, "the Secretary's interpretation would be entitled to deference given her official duty, specialized expertise, investigatory knowledge and other

-45-

experience relevant to carrying out the purposes of the Act."
*Kaspar Wire Works, Inc.*, 268 F.3d at 1131. "In situations in which
the meaning of [regulatory] language is not free from doubt, the
reviewing court should give effect to the [Secretary's]
interpretation so long as it is reasonable, that is, so long as the
interpretation sensibly conforms to the purpose and wording of the
regulations." *Martin v. OSHRC*, 499 U.S. 144, 150 (1991) (internal
quotations and citations omitted). This deference is given to the
Secretary, not the Commission. *Id.* at 158 ("although we hold that
a reviewing court may not prefer the reasonable interpretation of
the Commission to the reasonable interpretations of the Secretary,
we emphasize that the reviewing court should defer to the Secretary
only if the Secretary's interpretation *is* reasonable") (emphasis in
original). Thus, the inquiry is in two parts: (1) whether the
language is ambiguous; and (2) whether the Secretary's
interpretation is reasonable. If so, we *must* defer to that
interpretation.

A

At the time of the violations, 29 C.F.R. § 1926.1101(h)(1)
stated, "[t]he employer shall provide respirators, and ensure that
they are used . . . ." The majority opinion finds that this
language *unambiguously* precludes per-employee citations. The
majority finds that, "there is simply no language in the general
respirator protection section that suggests the unit of prosecution
could be based on each individual employee not receiving a

-46-

respirator versus the employer's course of action in failing to provide respirators to his *employees as a whole* for the Class I asbestos job." (emphasis added). However, there is also no language in the general respirator section that suggests the section is violated only when the employer does not provide respirators to "employees as a whole."[18] The majority's reading also does not comport with the explicit purpose of OSH Act, which is "to assure so far as possible *every working man and woman* in the Nation safe and healthful working conditions. . ." 29 § U.S.C. 651(b) (emphasis added); *Chao v. Mallard Bay Drilling*, 534 U.S. 235, 245 n.9 (2002). The use of the singular "man" and "woman" suggests a focus on the individual employee. Since the plain language does not specify whether per-employee citations are permitted, the language is ambiguous.

The next step in the inquiry is whether the Secretary's interpretation is reasonable. It is irrelevant whether the Commission's interpretation is also reasonable as the discretion is in the Secretary's hands. *Martin*, 499 U.S. at 158.

It is a reasonable interpretation of 29 C.F.R. § 1926.1101(h)(1) to issue per-employee citations. "As long as employees are working in a contaminated environment, the failure to provide each of them with appropriate respirators could constitute a separate and discrete violations [sic]." *Hartford Roofing Co.*,

---

[18] Such an aggregate reading of 29 C.F.R. § 1926.1101(h)(1) could be read to mean that when an employer provides most))but not all))of its employees with respirators, it is still not in violation of the general respirator protection section.

1995 WL 555498, at \*7. Thus, *Hartford* makes the distinction between the individual act of removing contaminates from the air and the multiple acts of providing respirators. *Id*. The former is subject to a single citation while the latter is subject to multiple citations. Providing one employee with a respirator does not abate the violation for other employees. *Id*. The requirement also states that the employer shall "ensure that [the respirators] are used." 29 C.F.R. § 1926.1101(h)(1). Obviously, ensuring individual usage requires action on a per-employee basis.

The subsections of 29 C.F.R. § 1926.1101(h)(1) also suggest the potential for per-employee citations (or, at the very least, suggest the absurdity of precluding per-employee citations for the general respirator protection section). For instance, employers are required to perform periodic individual face fittings for the respirators. 29 C.F.R. § 1926.1101(h)(4). In addition, employers are required to provide specific types of respirators depending on employee requests. 29 C.F.R. § 1926.1101(h)(4). These requirements are clearly employee specific. The employer cannot provide *any* respirator; it must conform to the subsections of 29 C.F.R. § 1926.1101(h)(1) in providing *employee specific* respirators. Thus, the Secretary reasonably interpreted the ambiguous language of 29 C.F.R. § 1926.1101(h)(1) and we must defer to her interpretation.

B

Section 1926.1101(k)(9)(i) states, "[t]he employer shall, at no cost to the employee, institute a training program for all

-48-

employees . . ., and shall ensure their participation in the program." Section 1926.1101(k)(9)(viii) states, "[t]he training program shall be conducted in a manner that the employee is able to understand." The majority opinion finds that, while the language is ambiguous, the Secretary's interpretation))allowing per-employee citations))is unreasonable. The majority opinion reasons that one training program could have abated the violation if all eleven employees had attended and understood. Ho, of course, did not conduct a training program for *any* of his employees. While the majority provides *a* reasonable interpretation of the training requirement, it fails to show how the Secretary's interpretation is unreasonable.

The majority opinion relies on *Sec'y of Labor v. Andrew Catapano Enters., Inc.*, Nos. 90-0050, 90-0189, 90-0190, 90-0191, 90-0192, 90-0193, 90-0771, 90-0772, 91-0026, 1996 WL 559899 (O.S.H.R.C. Sept. 30, 1996) for the proposition that only "employee-specific unique circumstances" merit citations "based on each failure to train an individual employee." This reading misstates the holding in *Catapano*. The Commission in *Catapano* found "[t]he language of the standard))'[t]he employer shall instruct each employee'))clearly may be read to permit the Secretary to cite separate violations based on the failures to train individual employees." *Id*. at *5. The Commission did not vacate the multiple citations on a per-employee basis but on a per-*inspection* basis. The Commission reasoned that each new inspection

could not result in a separate citation when "the employees did not change, and the working conditions and applicable regulations did not change."  *Id*.

Even the majority's "employee-specific unique circumstances" standard is met by the failure to train employees and ensure that the employees understand the training.  *Reich v. Arcadian Corp.*, 110 F.3d 1192, 1198-99 (5th Cir. 1997) ("An employee could be a unit of violation, however, only if the regulated condition or practice is unique to the employee (i.e., failure to train or remove a worker).").  While the single action of a group training session could have instructed the eleven workers at once, ensuring that each employee understood the training is employee specific. Thus, the majority has failed to show how the Secretary's interpretation is unreasonable.  Accordingly, I would reverse the Commission's determination that per-employee citations are prohibited.

II

The majority opinion affirms the Commission's finding that the Ho Entities are not alter egos of Ho because they "maintained separate corporate identities, tax identities, bank accounts, and legitimate business operations."  In determining whether a corporation is an alter ego of an individual for reverse corporate piercing purposes, courts consider the totality of the circumstances, including "the total dealings of the corporation and the individual, the amount of financial interest the individual has in the corporation, the ownership and the control that the

individual maintains over the corporation, and whether the corporation has been used for personal purposes." *Estate of Lisle v. Comm'r of Internal Revenue*, 341 F.3d 364, 375-76 (5th Cir. 2003).

Courts need to look beyond formalities and records to determine the true economic relationship between the entities. *United States v. Jon-T Chems., Inc.* 768 F.2d 686, 693 (5th Cir. 1985) (finding that "the courts are concerned with reality and not form, with how the corporation operated and the individual defendant's relationship to that operation"). In *Jon-T Chemicals*, the court dismissed the formality of recording paid expenses as loans because "whenever [one company] could not pay its bills, [the other company] did so by writing a check." *Id.* at 695. The companies shared an accounting department and "funds were transferred between the different [companies'] accounts in order to cover deficiencies." *Id.* That is precisely what happened here. The Ho Entities shared one bookkeeper who notified Ho when one account was deficient; Ho would then transfer the funds to cover the deficiency of the other company.

The evidence shows that Ho has complete control over the Ho Entities. Ho owns two-thirds of the stock and is president of both companies. The Ho Entities advanced the vast majority of Ho's personal investment of the property.[19] In addition, the Ho Entities

---

[19] An undisclosed "outside source" and two other corporations, one of which Ho owns, contributed the rest. These sources are not involved in the OSHA proceedings.

provided funds for the workers' wages and for supplies and equipment. Converting a hospital into residential units has nothing to do with the Ho Entities' business purposes of transportation and fruit sales. While the frequent transfers among the Ho Entities and Ho were documented as debts, there were no loan documents, no interest due, no schedule for repayment and no representation of debt repayment. Accordingly, I believe that substantial evidence supports a finding that the Ho Entities were Ho's alter egos and, thus, would vacate the Commission's order vacating the citations against the Ho Entities.

III

The majority opinion affirmed the Commission's finding that the violation of the General Duty Clause was "serious" instead of "willful," reasoning that there was no evidence compelling a willful finding for the *specific* instruction to tap the unmarked valve. The Commission's legal conclusions may be set aside if they are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *Mica Corp. v. OSHRC*, 295 F.3d 442, 447 (5th Cir. 2002). The General Duty Clause of the OSH Act requires an employer to provide "each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees." 29 U.S.C. § 654(a)(1).

"A violation is willful if it is committed with intentional, knowing or voluntary disregard for the requirements of the Occupational Safety and Health Act." *Hartford Roofing Co.*, 1995 WL

555498, at *2. *See also AJP Constr., Inc. v. Sec'y of Labor*, 357 F.3d 70, 74 (D.C. Cir. 2004) (finding that "a willful violation of the Act constitutes an act done voluntarily with either an intentional disregard of, or plain indifference to, the Act's requirements"). Ho conceded that tapping into an unmarked pipe at a demolition site was a "recognized hazard." Instructing his employees to tap an unmarked pipe))a "recognized hazard")) evidences a plain indifference to the General Duty Clause. Even without the benefit of hindsight, it is self-evident that tapping an unmarked pipe is "likely to cause death or serious physical harm." Therefore, the Commission abused its discretion by finding Ho's violation of the General Duty Clause "serious" instead of "willful." Accordingly, I would vacate the Commission's order reducing the General Duty Clause violation to serious from willful.

For the above stated reasons, I respectfully dissent.